246 N.J. Super. 167 (1990)
586 A.2d 1348
SIMON LEVIN, PLAINTIFF,
v.
ROBINSON, WAYNE & LA SALA, ESQ., AND DONALD A. ROBINSON, ESQ., RONALD J. RICCIO, ESQ., ROBERT A. WAYNE, ESQ., THOMAS D. RUANE, ESQ., JOSEPH P. LA SALA, ESQ., AND JOHN D. ARSENEAULT, ESQ., DEFENDANTS.
Superior Court of New Jersey, Law Division Essex County.
Decided October 19, 1990.
*170 R. Gregory Leonard for plaintiff (Leonard & Butler, attorneys).
Frederic K. Becker for defendants (Wilentz, Goldman & Spitzer, attorneys, Roger B. Kaplan, of counsel, Richard B. Robins, on the brief).

OPINION
VILLANUEVA, J.S.C.
This is a motion for summary judgment made by the defendants to dismiss the complaint of a former law partner against the partnership for a claimed value of his partnership interest.
Plaintiff Simon Levin ("Levin") was a partner of the defendant law firm of Robinson, Wayne & La Sala ("RW & L"), *171 formerly Robinson, Wayne, Levin, Riccio & La Sala. He resigned from the firm on April 28, 1988 to practice law with another Newark law firm. He sues his former law firm and six individual defendants, all of whom are present or former partners in RW & L.[1]
Levin claims that, although there was no partnership agreement, he is owed a balance attributable to his partnership interest based upon various theories.
The issue is whether plaintiff, having asserted in his matrimonial action that he had received all funds to which he was entitled pursuant to the Partnership Agreement, can assert a contrary position in a subsequent law suit against the partnership.
The court concludes that plaintiff's causes of action are barred by the doctrine of judicial estoppel because the claims are based on positions which are entirely inconsistent with positions which he previously took in his matrimonial action.

I

A. Plaintiff's Divorce Action

Levin was sued for divorce by his former wife in December 1986, wherein she sought, inter alia, equitable distribution of Levin's assets including his partnership interest in RW & L. The divorce decree, granted in November 1989, incorporated the parties' settlement agreement, which permitted Levin to retain his interests in his law practice except for certain pension and profit sharing benefits from RW & L. The lawyer for Levin's *172 ex-wife told Judge Cass that Mrs. Levin waived "any and all claims to any law firm practice that Mr. Levin might have specifically, whether from his old practice or from his new."

B. Plaintiff's Claims in This Action

Although Levin resigned from RW & L in April 1988, he received his full withdrawal distribution from the firm in August 1988. However, it was not until May 1990 that he instituted this action. He also filed an amended complaint two days later. He states that on September 1, 1973, he became a partner in the predecessor firm to RW & L and remained a partner until April 28, 1988. He further states that upon his departure from the partnership he made a demand to be paid what he was owed for his interest in the partnership, and on August 1, 1988, he was paid $24,958.63 for this interest.
Levin claims that he is owed "his partnership interest estimated to be three hundred thousand dollars ($300,000.00), and... his pro rata share of the net distributable profits" of the partnership.
Levin also alleges that a RW & L client gave defendants Robinson and Riccio personal family gifts, which should have been treated as partnership income and property, at least for the purpose of determining the value of Levin's partnership interest.
Levin further alleges that there was an oral partnership agreement which entitled him, as a withdrawing partner, "to receive: (1) his net capital account, (2) an amount equal to his pro rata share of the net distributable profits of the firm for that portion of its then current year, and (3) an amount equal to thirty rounds as `rounds' was defined in their partnership agreement."
Although Levin alleges that there was "no written partnership agreement in existence", he then alleges that "in the event the court finds such an agreement to exist, he demands judgment, alternatively, under the terms of the agreement".
*173 Levin also alleges that in late 1987 and early 1988, defendants conspired to "force" him to resign from the RW & L firm by reducing the partners' draw ("rounds"), based upon the financial condition of the firm. This reduction, Levin claims, put undue pressure on him to resign from the firm due to the pendency of his divorce action.

C. Levin's Certifications And Positions In His Divorce Action

Prior to his departure from RW & L, Levin was embroiled in a bitterly contested matrimonial action. After Levin resigned from RW & L in April 1988, an equitable distribution issue arose between Levin and his wife over whether there was any value in his former partnership interest of RW & L. Levin's first sworn Case Information Statement ("CIS"), filed with the matrimonial court in December 1986, listed his interest in RW & L as $55,841. However, in a later CIS, sworn to on September 16, 1988, he did not even list his partnership interest in RW & L as having any value under Item No. 7 ("Businesses, Partnerships, Professional Practices") of "Part E  Balance Sheet". Levin's representations to the matrimonial court on these issues continued up to the conclusion of the matter in November 1989.
In his divorce action in April 1988, five months after Levin left RW & L, and after he had received the check from RW & L for $24,958.63 "completing all payments and obligations owed to [plaintiff] as a result of [plaintiff's] withdrawal from the Firm" Levin's wife produced an appraisal report prepared by Joseph G. Aronson dated October 3, 1988, purporting to establish a "value" of $254,062. for Levin's former partnership interest in RW & L for equitable distribution purposes.
On November 30, 1988, Levin filed a motion, certification and brief seeking "to bar plaintiff's expert report concerning the valuation of [Levin's] partnership interest in his former law firm" on the grounds that there was a written Partnership *174 Agreement, which he attached to his certification, and that Levin had already received everything he was entitled to receive for his partnership interest. Levin and his attorney filed certifications and made representations to the matrimonial court in late 1988 and 1989 which, defendants contend, estop and bar him from asserting and pursuing his claims in this action. As part of that motion, Levin certified:
2. The enclosed Agreement of Partnership fully governed my compensation during my employment with the firm ... and dictated the terms of my final payment upon departure from the firm.
3. I am aware that the payments made to other members of the firm upon their departure therefrom were made in complete accordance with said Agreement of Partnership.
* * * * * * * *
8. My understanding of the Agreement of Partnership is that I have received substantially all monies relating to my partnership interest (except for minor discrepancies)....
9. I received $24,958.63 from Robinson, Wayne, Riccio and La Sala (now Robinson, Wayne & La Sala) for my partnership interest.
The Partnership Agreement attached to Levin's certification set forth all his rights upon withdrawal from the partnership, which he certified that he had received. Although the Partnership Agreement was unsigned, he nevertheless swore in his certification that it was, in fact, the Agreement of Partnership. Therefore, Levin's contention that he did not represent in his matrimonial action that there was a "written" Partnership Agreement is frivolous. Moreover, there was an earlier Partnership Agreement dated October 1, 1977, which was executed by the partners, which contained substantially identical withdrawal provisions.
Thus, in order to avoid his wife's claim for equitable distribution of the purported "value" of his partnership interest in RW & L (asserted to be worth $254,062 by his wife's expert), Levin swore in the divorce action that there was a written Partnership Agreement; swore that it fixed all his rights upon withdrawal; and swore that the $24,958.63 which he had received for his partnership interest in August 1988 was his complete entitlement *175 under the Partnership Agreement. These certifications were made after Levin had spent three days with his wife's expert reviewing "all records relating to [his] former partnership".[2]
Levin's attorney in the divorce action made similar representations to the court in her brief when she stated:
The only equitable means of valuing defendant's interest in his prior law firm is what the firm has in fact paid him, which is consistent with the partnership agreement. ...

The firm of R, W, L, R & L fashioned a partnership agreement, a copy of which is attached to this letter brief as Exhibit B, through which the value of defendant's interest in the firm is readily ascertainable. Paragraph 18(b) of the partnership agreement states that `upon the effective date, the withdrawing proprietary partner's right, title and interest in the Firm shall be extinguished in consideration of the payments to or for him by the continuing Firm.' ....
Defendant Mr. Levin withdrew from the firm to practice law with another firm with its principal office located in the City of Newark. This very Court has already held that defendant terminated his association with R, W, L, R & L in good faith when plaintiff sought to enforce the pendente lite support order. Accordingly, pursuant to the payout provisions of the partnership agreement, defendant is not entitled to receive any other monies from his partnership interest at R, W, L, R & L.

Plaintiff's expert has failed to consider the agreement alleging, albeit unsupported, that he `has been advised that the agreement is not consistently followed and that withdrawing partners generally negotiate the terms of their own withdrawal.' Neither plaintiff nor plaintiff's expert have produced any facts to support this allegation. The evidence is clearly to the contrary. At R, W, L, R & L all of the partners agreed to Exhibit B and have conformed their dealings pursuant to the agreement. See Certification of defendant attached hereto as Exhibit E. The agreement had been followed as is evidenced in the case of others who have left the firm.

Upon his withdrawal from R, W, L, R & L, defendant received $24,958.63 representing defendant's capital account. Pursuant to the agreement, as evidenced by Exhibit C, defendant is not entitled to any additional monies for his partnership interest. The defendant understands Exhibit C, the letter received from the managing partner, to mean that he has been paid in full by his former firm. The defendant is unaware of any cause of action that he *176 might pursue against his former firm in order to obtain a greater amount of money. ...

In conclusion, the value of defendant's interest in R, W, L, R & L was established when he terminated his association with the firm. As had been in the past practice, he received all monies to which he was entitled by his partnership interest. Defendant does not know of any additional money to which he is entitled for his partnership interest ... (emphasis added).
Even as late as August 28, 1989, Levin's attorney in the divorce action filed another brief in further support of Levin's motion to bar his wife's valuation of his former partnership interest. In that brief (filed seventeen months after Levin left RW & L) Levin's attorney again asserted:
The first flaw in Mr. Aronson's report is that it is based upon an incorrect premise `... that withdrawing partners generally negotiate the terms of their own withdrawal....' To the contrary, all of the former partners abided by the terms of the Agreement; there was no negotiation. See Certification of Simon Levin, attached to defendant's November 30, 1988 letter brief as Exhibit E.
The second flaw of Mr. Aronson's report is that he ignores the fact that defendant has received all funds to which he is entitled pursuant to the partnership agreement ... See defendant's letter brief of November 30, 1988, at page 2, and cases cited therein.
Plaintiff refuses to accept the fact that defendant has received all funds to which he is entitled to by the partnership agreement and is trying to create an issue where none exists. Defendant has received $24,958.63 upon his withdrawal from RW & L. This was in accordance with the partnership agreement and did not involve any negotiation as alleged by the plaintiff. If defendant had been able to negotiate his pay-out, or not abide by the partnership agreement, he would have negotiated a pay-out for more than $24,958.63....
As a result of the foregoing flaws, the expert report of Joe Aronson is not itself sufficiently reliable, and is not based on facts, and must be barred ... Moreover, it would be truly inequitable for the court to value defendant's interest in RW & L for a greater amount than defendant has been paid and force defendant to split a hypothetical figure that is over ten times his actual payment....
Plaintiff is certainly entitled to a portion of defendant's law partnership; however, the valuation of that asset has been clearly and unequivocally determined. Since the value of defendant's interest in RW & L has been clearly determined, plaintiff's expert report will not assist the trier of fact and should be barred. (emphasis added).
A final judgment of divorce was entered on November 13, 1989. While a number of assets are included in the "Equitable Distribution" provisions of the judgment, including a 50/50 split *177 of Levin's pension and profit sharing plans at RW & L, there was no equitable distribution ordered of any partnership interest Levin had in RW & L. In fact he retained that interest, even though it had been "reduced" to cash by November 13, 1989. Defendants contend that shortly after Levin's divorce action was concluded, if not earlier, he retained attorneys to pursue the present claims,[3] which are inconsistent with the positions and representations made by him and his attorney in his divorce action.
Levin shifted his factual and legal positions from one tribunal to another to benefit his own economic interests. In a letter, sent as prelude to the present action, Levin and his present attorneys adopted and relied on the very same expert report offered by Levin's wife in the divorce action, which Levin had moved to suppress as being irrelevant, unreliable and inconsistent with the Partnership Agreement.
In relying on that expert report, Levin now refers to the report and its author as "irrefutable" and "highly respected". Thus, Levin, through his present attorney, takes the ultimate "about face" position.[4]

D. Gifts to Other Partners

Levin also alleges that Robinson and Riccio received gifts from a client and that those gifts should have been included as *178 partnership income, for appraisal purposes, thereby increasing the appraised value of the partnership for which plaintiff seeks his interest. Levin, senior tax attorney of the firm, has not denied that he knew about such gifts when they were made and when he left in April 1988. He and his attorney nevertheless asserted in his divorce action that he "is not entitled to receive any other monies from his partnership interest", that he "is not entitled to any additional monies for his partnership interest", that he "received all monies to which he was entitled by his partnership interest," and that he "is unaware of any cause of action that he might pursue against his former firm in order to obtain a greater amount of money."

E. Plaintiff's Reasons Why Judicial Estoppel Should Not Apply

Levin argues that the doctrine of judicial estoppel is not applicable herein because: (1) the position he asserted in the matrimonial action was asserted in good faith and upon advice of counsel; (2) defendants fail to mention that the motion to suppress the expert report was never heard or decided by the court; (3) Levin's partnership interest in RW & L was never hidden from his ex-wife; (4) defendants have taken a statement contained in one of Levin's matrimonial certifications out of context; (5) defendants have failed to mention that Levin's matrimonial action and, in particular, the equitable distribution issues, were settled without any judicial determination; and (6) defendants rely upon a Partnership Agreement that was terminated.

II
The doctrine of judicial estoppel prevents a party from arguing contradictory positions in different actions in court. Shell Oil Co. v. Trailer & Truck Repair Co., Inc., 828 F.2d 205, 209 (3d Cir.1987). As the Court of Appeals explained in Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d *179 414 (3rd Cir.), cert. den., 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988):
"This doctrine, distinct from that of equitable estoppel, applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted. Judicial estoppel looks to the connection between the litigant and the judicial system while equitable estoppel focuses on the relationship between the parties to the prior litigation." [848 F.2d at 419].
See also Duplan Corp. v. Deering Milliken, Inc., 397 F. Supp. 1146, 1177 (D.S.C. 1975) ("That an estoppel can arise because of a prior inconsistent claim or position taken in a judicial proceeding is clear. A party cannot have its cake and eat it too.... [This] is generally known as judicial estoppel or the doctrine of preclusion against inconsistent positions"); See also, 1B Moore's Federal Practice, ¶ 0.405[8], (Second Ed. 1984).
Virtually all courts have recognized that the doctrine of judicial estoppel is fundamental in protecting the integrity of the judicial process. As the Court explained in USLIFE Corp. v. U.S. Life Ins. Co., 560 F. Supp. 1302 (N.D.Tex. 1983):
The doctrine of judicial estoppel is an equitable principle which generally operates to preclude a party from asserting a position in a legal proceeding inconsistent with a position taken by that party in the same or a prior litigation.... [T]he judicial estoppel doctrine looks to the relationship between the litigant and the judicial system and `is intended to protect the integrity of the judicial process.' As a general matter, judicial estoppel applies in cases where a party attempts to contradict his own sworn statements in the prior litigation ... [C]ourts seek to prevent parties from `playing fast and loose' with them to suit the exigencies of self interest. See Scarano v. Central Ry. Co. of New Jersey, 203 F.2d 510, 513 (3rd Cir.1953). (Citations omitted). [Id. at 1304-1305].
See also Vennerberg Farms, Inc. v. IGF Ins. Co., 405 N.W.2d 810, 814 (Iowa Supreme Ct. 1987).
The courts have not hesitated to apply the doctrine of judicial estoppel when a litigant seeks to take inconsistent judicial positions. Murray v. Silberstein, 882 F.2d 61, 66 (3d Cir.1989) (bail commissioner was judicially estopped from contending that he was entitled to monetary relief in action challenging his discharge after he had obtained preliminary injunction by arguing that money damages were unavailable); Scarano v. Central R. Co. of New Jersey, 203 F.2d 510, 513 (3d Cir.1953) *180 (railroad employee held judicially estopped from contending that he was physically rehabilitated and entitled to be restored to duty by fact that he had asserted in FELA claim that he would be unable to work because of his injuries).
Although Levin made sworn statements to the court in his matrimonial action, judicial estoppel also applies to his attorney's representations in the briefs submitted to the matrimonial court. Lewandowski v. National R.R. Passenger Corp., 882 F.2d 815, 818-19 (3d Cir.1989). Duplan Corp. v. Deering Milliken, Inc., supra, 397 F. Supp. at 1179.
The positions which Levin's attorney set forth in her briefs submitted to the matrimonial court were advanced in the course of the judicial proceeding so as to render the judicial estoppel doctrine applicable.
New Jersey courts have adopted and consistently applied the principle of judicial estoppel. See Tabloid Lithographers, Inc. v. Israel, 87 N.J. Super. 358, 365, 209 A.2d 364 (Law Div. 1965) (plaintiff could not present evidence contradicting his prior affidavit: "If one statement is true, the other cannot be"); In re Perrone, 5 N.J. 514, 527, 76 A.2d 518 (1950) (husband's representation to court that deposits in account belonged originally to him rather than to wife worked a judicial estoppel to new claim as to survivorship interest in deposits: a party "cannot be heard ... to contend for two diametrically opposed" positions); See also: Stretch v. Watson, 6 N.J. Super. 456, 469, 69 A.2d 596 (Chan.Div. 1949), aff'd in part, rev'd in part on other grounds, 5 N.J. 268, 74 A.2d 597 (1950).
A party will not be permitted to play fast and loose with the courts nor to assume a position in one court entirely different or inconsistent with that taken by him in another court or proceeding with reference to the same subject matter. Koppel v. Olaf Realty Corp. 56 N.J. Super. 109, 121, 151 A.2d 577 (Ch.Div. 1959), aff'd. 62 N.J. Super. 103, 162 A.2d 306 (App. Div. 1960).
*181 The principle of judicial estoppel applies in this case to prevent Levin from now arguing that he is entitled to anything from the RW & L partnership in addition to what he received when he resigned. In his divorce action, Levin certified and his attorney represented that Levin had received all that he was entitled to receive from the partnership under the Partnership Agreement. Levin cannot now make contrary assertions to this court. Such a shifting of positions in order to serve disparate economic positions epitomizes the "fast and loose" conduct that the courts will not tolerate.
The cases are legion in which a party was judicially estopped to advance a different litigation position from the position he took in his prior divorce action. In Stretch v. Watson, supra, the plaintiff husband left his wife in New Jersey and filed a divorce petition in Nebraska, wherein he stated under oath that his wife had sold the marital home in New Jersey, had retained all resulting profits and that he had no interest in the property (asserted by plaintiff in the divorce action to avoid providing support for his wife and children). Plaintiff later filed suit in New Jersey alleging that his name was wrongfully erased from the deed of conveyance and demanding one half of the amount paid for the property. The court dismissed plaintiff's complaint, holding:
The plaintiff having condoned the sale in one suit in order to avoid liability for the support of his children, should surely not now be heard to complain after having received the indirect benefit of such condonation. A party will not be permitted to play fast and loose with the courts, nor to assume a position in one court entirely different from and inconsistent with that taken by him in another court or proceeding with reference to the very same matter or thing. ... His actions in the Nebraska court in recognizing and acquiescing in the conduct of his wife in disposing of the Shiloh property are sufficient to now estop him from assuming the inconsistent position of now disputing or contesting such disposition. (6 N.J. Super. at 469-70, 69 A.2d 596) [emphasis added].
Courts in other jurisdictions have reached the same result under analogous factual circumstances. In Allen v. Allen, 550 P.2d 1137 (Wyo. Supreme Ct. 1976), a father brought a declaratory judgment action requesting adjudication of his rights under a deed in his son's name. The son had asserted in his prior divorce litigation that the property was transferred to him from *182 his father merely as a "straw man" solely to give him adequate property to secure a loan, and that upon satisfying the mortgage he would reconvey the property back to the father. The Supreme Court of Wyoming held that the son's statements in the prior divorce action judicially estopped him from denying his father's rights under the deed. The court held:
The defendant himself has established the agreement and he is bound by the doctrine of judicial estoppel. In the earlier divorce litigation, the defendant-son, in order to prevail with respect to the ranch property as against his wife, had to rely on his agreement with his father that he held the River Place in his name only for the purpose of furnishing security to the Farmers Home Administration to enable him to borrow money to buy the Haptonstall Place. The principle, while denominated judicial estoppel, is sometimes referred to as a doctrine which estops a party to play fast and loose with the courts or to trifle with judicial proceedings. It is an expression of the maxim that one cannot blow hot and cold in the same breath. A party will just not be allowed to maintain inconsistent positions in judicial proceedings, as here.... It is that very inconsistency that judicial estoppel will not tolerate. Defendant's statements in the previous action are the very highest order of evidence against him and are entitled to judicial sanctity. He cannot play hanky-panky with the courts of this state and thus interfere with the integrity of the judicial system. [Id. at 1142].
Similarly, in Finley v. Kesling, 105 Ill. App.3d 1, 60 Ill.Dec. 874, 433 N.E.2d 1112 (1982), plaintiff, then owner of the Oakland Athletics baseball team, testified in his 1974 divorce action in Indiana that he owned 31% of the stock of his corporation, his wife 29%, and his children 40% (so as to exclude the children's 40% interest in dividing the property). In 1980, the corporation adopted a plan for liquidation and distribution. In a 1982 suit, plaintiff then sought a declaratory judgment that he was the beneficial owner of 40% of stock that he previously had testified was owned by his children. In dismissing the 1982 action, the court held that "under the doctrine of judicial estoppel," the plaintiff "... cannot now contend that the stock is, in effect, his property." Id. 105 Ill. App. at 10, 60 Ill.Dec. at 881, 433 N.E.2d at 1119.

III
In his matrimonial action Levin represented to the Court as late as August, 1989, that his (written) Partnership Agreement *183 was enforceable, governed what he was entitled to receive from the partnership and precluded his receipt of any further funds from RW & L. He asserts that these representations do not preclude his adoption of the opposite position in this lawsuit to recover additional monies, contending that the prior representations were premised on a good faith mistake of law.[5] He asserts that he is entitled to "correct" his prior mistaken position because his "mistake" purportedly was not intended to mislead the court. However, regardless of Levin's purported motives or intent for doing so, he cannot now contradict the position which he intentionally advanced in his prior action.
The claimed "good faith mistake" exception upon which Levin relies in contending that he was under a mistaken belief as to the legal enforceability of the Partnership Agreement is inapposite here. Levin's prior position and the contradictory position now taken are factual: Levin contended in the prior action that the written Partnership Agreement (either the signed agreement effective as of October 1, 1977 or, as Levin represented to the matrimonial court, a subsequent unsigned agreement containing substantially identical terms), was in full force and effect. Levin contends now that the agreement is unenforceable because he and his former partners had terminated the written agreement and were operating under a purported oral agreement.
The factual inconsistency in Levin's position is clear: Levin and his matrimonial attorney repeatedly represented to the matrimonial court that the written Partnership Agreement attached to Levin's certification fully governed his compensation rights relating to the partnership. Now, Levin and his present attorney represent to this court that Levin's withdrawal from the firm "is not governed by any [written] partnership agreement" *184 but, instead, by a purported oral agreement or by the provisions of the Uniform Partnership Act.
Levin's reliance upon a purported good faith mistake of law exception to the judicial estoppel doctrine ignores this direct inconsistency which bars him from maintaining this action.[6]
Levin's assertion that by writing a letter to his wife's lawyer on August 10, 1988 seeking her "guidance as to what action Mr. Simon should take with regard to any additional money you believe he is entitled to" was an obvious ploy. How could Levin's wife or her attorney aid Levin against the partnership when Levin himself had acknowledged that he had already received $24,958.63 for his partnership interest? This request certainly is not evidence of good faith. At best it was a self-serving meaningless gesture.
The doctrine of judicial estoppel, as an equitable doctrine, is subject to the court's sound discretion, Matter of Cassidy, 892 F.2d 637, 642 (7th Cir.1990), and is applied only where there are present intentional inconsistencies. It is not applied where doing so would work an injustice. Ibid. Invoking the doctrine of judicial estoppel in the matter sub judice would not create an injustice. Failure to apply the doctrine would reward Levin at the expense of his ex-wife and destroy the integrity of the courts and judicial process.
To the extent that Levin argues contradictory positions as to the law regarding the legal enforceability of the Agreement, it is well established that opinions of law urged upon courts clearly have judicial estoppel effect. As the Court of Appeals noted in Hardwick v. Cuomo, 891 F.2d 1097, 1105 n. 14 (3d Cir.1989), "[T]his court has recognized the doctrine of judicial estoppel to bind parties to factual and legal positions taken in *185 litigation in both the case in which the party has taken a position and in subsequent litigation ..." (emphasis supplied), citing Lewandowski v. National R.R. Passenger Corp., supra, 882 F.2d at 819.
Even an erroneous belief in the correctness of a prior judicial position will not prevent judicial estoppel effect once the position is urged upon a court. Matter of Cassidy, supra, 892 F.2d at 642 ("[T]he change of position on the legal question is every bit as harmful to the administration of justice as a change on an issue of fact."); United States v. Starrett City Assoc., 605 F. Supp. 262, 264 (E.D.N.Y. 1985) (doctrine applies to assertions of law or fact).
Moreover, any exception to the doctrine of judicial estoppel based on positions of law allegedly asserted "in good faith" would essentially render the doctrine meaningless because a party could always claim in a subsequent proceeding that the position of law which it had taken at a prior proceeding was "inadvertent" and based upon a "good faith mistake" of the applicable law. This case represents a perfect example of why there is no good faith exception with respect to mistake of either the facts or the law. What Levin urges is that, merely by his statement that he made such a mistake, judicial estoppel is not a bar to his causes of action and the matter must proceed to trial. If the courts were to entertain such claims of "good faith mistake" (which would be difficult to refute because they could arguably be based on the claimant's internal, subjective state of mind), the doctrine of judicial estoppel would be emasculated or severely eroded, and, accordingly, its purpose subverted. Levin even attempts to support his position with hearsay statements made by his matrimonial lawyer. R.1:6-6.
This is the precise point enunciated in Patriot Cinemas, Inc. v. General Cinema Corp., 834 F.2d 208 (1st Cir.1987), a case upon which Levin relies. That court rejected plaintiff's claim of good faith mistake in assessing its legal position in pending litigation, and held plaintiff barred by judicial estoppel from *186 pursuing certain claims which it had previously agreed to waive.
Accepting Levin's statements in their best light he has merely shown that he was ignorant of the law.
However, in Konstantinidis v. Chen, 626 F.2d 933 (D.C.Cir 1980), which plaintiff describes as the "seminal case" on the good faith exception, the claim of good faith mistake was based on a mistake as to the origin of plaintiff's medical problems (i.e., whether due to an accident in the course of employment or subsequent medical treatment which plaintiff received for the injury)  a matter which the court suggested was not free from doubt  and thus was very different from the mistake as to the existence and enforceability of the Partnership Agreement, which Levin argues here. The refusal of the court to apply the doctrine of judicial estoppel in Konstantinidis was based upon the determination of the court, applying state law in a federal diversity action, that the courts of the District of Columbia have not recognized the doctrine of judicial estoppel.
Levin's assertion that his purported "mistake of law" was not "intentional" (and so provides no basis for the bar of judicial estoppel) is without foundation. In Wang Laboratories v. Applied Computer Sciences, Inc., 741 F. Supp. 992 (D.Mass. 1990) the court expressly rejected the type of argument Levin now makes:

Regardless of what motivates a party to offer contradictory positions in different proceedings, `[t]he primary concern of the doctrine of judicial estoppel is to protect the integrity of the judicial process.' United States v. Lavasseur, 846 F.2d 786, 792 (1st Cir.1988).... Therefore, when considering whether to estop a party from taking a position, a court should consider whether that party took the opposite position in a prior judicial proceeding, not whether the party now taking a contradictory position intended to deceive that court. (emphasis added). [Id. at 996].
In Wang, the court held that defendant was judicially estopped from denying that it had entered into a valid settlement agreement with plaintiff, even though the court "expresse[d] no opinion as to whether [the parties] or any of their several attorneys have attempted to deceive it." Id., at 997, n. 5.
*187 In any event, there simply has been no mistake, good faith or otherwise, shown by Levin. There was no unintentional error committed by him.
Levin's position fails to recognize the meaning of "intentional". For purposes of judicial estoppel, a party makes intentionally inconsistent statements when he unequivocally asserts a position of law or fact in one proceeding and knowingly proceeds to assert a contrary position in a subsequent proceeding. The essential elements for the application of the doctrine of judicial estoppel are an unequivocal assertion of the law or fact by a party in one judicial proceeding. United States v. Starrett City Associates, 605 F. Supp. 262, 264 (E.D.N.Y. 1985). See also, Schultz v. Wellman, 717 F.2d 301 (6th Cir.1983); Edwards v. Aetna Life Ins. Co., 690 F.2d 595 (6th Cir.1982); Donovan v. U.S. Postal Service, 530 F. Supp. 894 (D.D.C. 1981).
It is undisputed that Levin intentionally and unequivocally asserted in his matrimonial action that he had received all that he was entitled to receive from the partnership under the Partnership Agreement. Therefore, he is judicially estopped from asserting the wholly inconsistent position which he now urges upon this Court.

IV
Levin is bound to the positions which he adopted in his matrimonial action regardless of whether those positions were "successfully maintained".
Levin further attempts to purge his prior representations to the matrimonial court of any judicial estoppel effect by contending that, because his divorce action ended in a settlement (albeit a court-approved settlement), his prior position was not "successfully maintained," and he is thus not precluded from now adopting the opposite position in this lawsuit.
However, contrary to Levin's argument, the judicial estoppel doctrine is fully applicable whether or not the position first *188 assumed has been "successful". In Hoffman v. First National Bank of Akron, 99 B.R. 929 (N.D.Iowa 1989), the court explained:
Judicial estoppel lies when a party, after assuming a certain position in a legal proceeding, attempts to assume a contrary position. It applies whether the position first assumed has been successful or not. Quoting In re Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G., New York Branch, 55 B.R. 253, 259 (S.D.N.Y. 1985). (emphasis added). Id. at 935.
See also Zwemer v. Production Credit Ass'n. of Midlands, 792 P.2d 245 at 247 n. 3 (Wyo. 1990).

V
The doctrine of judicial estoppel applies regardless of whether the first position was "successfully maintained." Allen v. Allen, supra, 550 P.2d at 1142.
In Wade v. Woodings-Verona Tool Works, Inc., 469 F. Supp. 465 (W.D.Pa. 1979), the court held that plaintiff's representation that he would not assert a patent infringement claim against defendant tool manufacturer judicially estopped plaintiff from later bringing such a claim regardless of whether his position in the initial action was successfully maintained. The court explained:
In light of this sworn representation, any subsequent attempt to assert a suit for infringement would be foreclosed by the doctrine of judicial estoppel. The doctrine was first articulated by the United States Court of Appeals for the Third Circuit in Scarano v. Central R. Co. of New Jersey, 203 F.2d 510, 513 (3d Cir.1953), `a party may be precluded by a prior position taken in litigation from later adopting an inconsistent position in the course of a judicial proceeding.' ... As noted in Scarano the doctrine of judicial estoppel is distinct from other theories of estoppel and may be applied any time a litigant plays `fast and loose with the courts' which has been emphasized as an evil the courts should not tolerate.' ... The possibility that Wade may not subsequently prevail in the instant action does not preclude an application of the doctrine. [Id. at 467]. [emphasis added].
Plaintiff's position that a party must have "successfully maintained" its prior position in order to trigger judicial estoppel is an unjustified confusion of judicial estoppel with other types of estoppel. Judicial estoppel seek to preserve the integrity of the judicial process by preventing a party from asserting *189 inconsistent positions; collateral estoppel concerns the finality of determinations; and equitable estoppel concerns the relationship of the parties. Oneida Motor Freight, Inc. v. United Jersey Bank, supra, 848 F.2d at 419. This distinction between types of estoppel to which the court in Oneida Motor Freight, Inc., refers was articulated in Scarano v. Central R. Co. of New Jersey, supra:
[W]e emphasize that the `estoppel' we here apply is to be distinguished from the traditional `estoppel in pais'. Important prerequisites of that concept are lacking in the present case, for defendant did not believe and rely on plaintiff's statement.... Nor is the estoppel relied on here equivalent to `collateral estoppel' as that term is used in the Restatement of Judgments. That concept gives to the determination of actually litigated issues by valid and final judgment conclusiveness in all further litigation between the same parties ... Since, on the present record, there is a substantial dispute as to what the former judgment decided about plaintiff's physical condition, collateral estoppel cannot be employed at this stage.... The `estoppel' of which, for want of a more precise word, we here speak is but a particular limited application of what is sometimes said to be a general rule that `a party to litigation will not be permitted to assume inconsistent or mutually contradictory positions with respect to the same matter in the same or a successive series of suits.' [Id. 203 F.2d at 512-513.]
See generally Comment, Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel, 80 NW.U.L.Rev. 1244 (1986).
The court in Wade v. Woodings-Verona Tool Works, Inc., supra, recognized this distinction between estoppel doctrines in holding that success in maintaining the prior position is not a requirement of judicial estoppel:
While there is some disagreement among the circuits as to whether judicial estoppel should only foreclose successfully-maintained positions and successful litigants, ... [t]his court feels that such a limited application of the doctrine is a result of its being confused with other estoppel theories. See 1B Moore's Federal Practice Sec. 0.405[8] at 769-770, and Scarano, supra, at 512....
This court feels it proper to adhere to the spirit of a broader application as espoused in Scarano and would advocate its application to preclude a subsequent infringement suit by Wade without regard to his success in the present action. (emphasis added). [Id. 469 F. Supp. at 467, n. 2].
Contrary to Levin's assertion, no New Jersey court has ever adopted a requirement that a party must "successfully assert" the prior position to be judicially estopped from later asserting *190 a contrary position. In fact, the New Jersey cases have held that no such requirement exists. Thus, in Tabloid Lithographers, Inc. v. Israel, supra, where a printing company sued a corporation and its agent for sums due on work performed on the agent's order, plaintiff was judicially estopped from pursuing recovery against the agent by virtue of submitting an affidavit representing that the corporation was the defendant responsible for the sums due:

By filing an affidavit that it received its orders from Unified and delivered its products to that corporation, plaintiff has estopped itself from now presenting evidence under oath that it received its orders and delivered its products to the defendant Israel acting for himself. (emphasis added). [Id. 87 N.J.Super at 365, 209 A.2d 364].
Thus, the court in Tabloid applied the judicial estoppel doctrine based on the very making of a prior, inconsistent representation to the court, and not on the fact that plaintiff benefitted by its prior position. Id. at 365, 209 A.2d 364.
Preclusion by inconsistent positions, or judicial estoppel, is limited to change of position taken in judicial proceedings, but it is not based upon finality of judgments. 1B Moore's Federal Practice, ¶ 0.405(8), (Second Ed. 1984), p. 239.
In Milk Drivers, etc. Local 680 v. Cream-O-Land Dairy, 39 N.J. Super. 163, 120 A.2d 640 (App.Div. 1956), defendant employer argued at trial that the collective bargaining agreement was invalid. When the trial court held that the agreement was valid but had expired, defendant on appeal sought to forestall attachment of obligations under an extension of the agreement should the appellate court affirm its validity. The Appellate Division, while recognizing "[t]he rule prohibiting a party from maintaining inconsistent positions in judicial proceedings," held only that defendant was not judicially estopped from preventing a renewal of the agreement because the issue was not even raised before the trial court, Id. at 175-76, 120 A.2d 640. The alleged requirement of "prior success" was simply irrelevant. Thus, Levin's assertion that the court's decision in Milk Drivers in refusing to apply judicial estoppel was "predicated upon the *191 fact that, in the earlier action, Cream-O-Land had argued unsuccessfully and ... [t]hus, there was no chance that the court could be misled," misstates the facts and holding of the case.
Similarly, in Stretch v. Watson, supra, although plaintiff obtained an "indirect benefit" from his initial position, making his shift in positions particularly blatant, the court clearly set forth no requirement of prior success in order for judicial estoppel to apply. To the contrary, the court broadly condemned any conduct whereby a party "plays fast and loose with the courts" by "assum[ing] a position in one court entirely different from and inconsistent with that taken by him in another court or proceeding with reference to the very same identical matter or thing." 6 N.J. Super. at 469-70, 69 A.2d 596. This is precisely what Levin has done.
Accordingly, Levin's contention that he is not judicially estopped from contradicting his prior statements to the matrimonial court because that position was purportedly unsuccessfully maintained and he thus received no benefit therefrom, is contrary to the law.
Levin's claim that judicial estoppel is inapplicable if the prior matter terminates in a settlement is likewise erroneous because judicial estoppel has been applied where the prior disposition was a settlement. See Scarano v. Central R. Co. of New Jersey, supra, 203 F.2d at 510 (judicial estoppel applied where prior proceedings resulted in a general jury verdict for plaintiff and defendant then moved for a new trial, but before that notion was determined, a settlement was reached, pursuant to which the motion was withdrawn and judgment was entered for the amount of the settlement); Wallace v. Southern Pac. Co., 106 F. Supp. 742, 745 (N.D.Cal. 1951) (plaintiff could not recover for lost earnings or gain reinstatement where he had settled prior action seeking damages for loss of future earnings based on injuries he had alleged in the former case to be permanent).

*192 VI
In any event, Levin cannot prevail herein because the benefit which he received in the matrimonial proceeding as the result of his prior contradictory representations regarding the value of his interest in the firm is obvious. Levin's dispute with his wife regarding the value of his partnership interest was settled; his former wife abandoned her position that the matter could not be resolved unless his partnership interest was valued at the higher figure of $254,062 (as against $24,958.63 claimed by Levin), and he also waived all claims to his law practice.[7] The statement in the brief of Levin's present lawyer that Levin's "wife was given credit for the $254,062" is not supported by any certification. Levin's assertion that he received no benefit in the matrimonial proceedings from the position which he advanced regarding the value of his law firm interest is unsupported by any facts.[8]
However, courts have declined to invoke judicial estoppel because the position which later was contradicted had been rejected in the prior action. See, e.g., Coal Resources, Inc. v. Gulf & Western Indus., 865 F.2d 761, 773 (6th Cir.1989); LILCO v. Transamerica Delaval, 646 F. Supp. 1442, 1447 (S.D.N.Y. 1986).

VII
Levin contends that the firm's signed Partnership Agreement was somehow terminated as a result of three subsequent draft *193 agreements, notwithstanding that no party to this action (or anyone else) signed any of these purported agreements. Levin reasons that the mere existence of these unsigned draft agreements somehow establishes that the parties rescinded their prior, executed Partnership Agreement. Because Levin is judicially estopped from contesting that he was a party to a valid, binding Partnership Agreement, this court need not decide whether the purported unsigned draft "agreements" terminated or superseded the Partnership Agreement.

VIII
Nowhere in Levin's complaint does he mention the enforceability, or lack thereof, of a "restrictive covenant". However, in his opposing brief he contends that if the court were to find the Partnership Agreement enforceable, the restrictive covenant contained therein is unenforceable.
Levin asserts that even if he is judicially estopped from denying the existence and enforceability of the parties' executed Partnership Agreement, Paragraph 18(c) thereof, (which provides that a partner of over 10 years who voluntarily withdraws from the partnership for the purposes of commencing the practice of law in the City of Newark or with a firm in the City of Newark will receive the same retirement benefits, with respect to draws for six months after withdrawal, that withdrawing partners of less than 10 years receive), constitutes an unenforceable "restrictive covenant".
Levin contends that the restrictive covenant is unenforceable because its sole purpose is to deter competition and it does not protect any legitimate interest. Solari Industries, Inc. v. Malady, 55 N.J. 571, 585, 264 A.2d 53 (1970). Raven v. A. Klein & Co., Inc., 195 N.J. Super. 209, 213, 478 A.2d 1208 (App.Div. 1984).
He contends that the covenant serves to frustrate the intent of RPC 5.6[9] because it not only has a chilling effect upon the *194 right and power of an attorney without any stricture to do business with a former client of his, but it frustrates his right to do business in the City of Newark as well as upon the client's right to be represented by the attorney of his choice.
The seminal case on this issue is Dwyer v. Jung, 133 N.J. Super. 343, 336 A.2d 498 (Ch.Div. 1975), aff'd 137 N.J. Super. 135, 348 A.2d 208 (App.Div. 1975), which held that a covenant restricting a law partner "from doing business with a client designated by another partner for a period of 5 (five) years" was unenforceable because it was intended only to prevent competition and was injurious to the public interest. Id. 133 N.J. Super. at 346-347, 336 A.2d 498.
The Supreme Court, in exercising its supervisory role over attorneys, has determined that restrictive covenants among lawyers are detrimental to the public interest. Karlin v. Weinberg, 77 N.J. 408, 420, 390 A.2d 1161 (1978).
However, Levin is judicially estopped from now advancing this legal position for the same reason that he cannot deny the existence of the Partnership Agreement. Levin could have taken the position at his matrimonial action that the Partnership Agreement contained an allegedly unenforceable restrictive covenant, but instead he intentionally chose to assert that the Agreement was valid and binding. Levin cannot now advance the opposite position. By the time Levin and his attorney represented to the matrimonial court in 1988 and late 1989 that the payout provision was valid and binding upon him, the law upon which he now relies to invalidate that provision was already in existence.
The failure of Levin and his attorney to "discover" this position in a timely manner, even if true, cannot justify their *195 newly made contradictory representations regarding the validity of the Agreement to this court. See Department of Transp. v. Coe, 112 Ill. App.3d 506, 510, 68 Ill.Dec. 58, 60, 445 N.E.2d 506, 508 (1983). ("The doctrine of judicial estoppel is an equitable doctrine whose primary purposes are to promote the truth and to prevent parties from deliberately shifting positions to suit the exigencies of the moment").
Therefore, this court need not decide whether this provision is enforceable.[10]
When Levin certified in his divorce action that he was "not entitled to receive any other monies from his partnership interest in R, W, L, R & L," it obviously included claims for gifts to partners, salary, draws, "rounds," severance pay, profits and proprietary interest. Therefore, he is barred from asserting those claims in this action.

IX
Defendants' motion for summary judgment to dismiss the complaint is granted.
NOTES
[1] Defendants Donald A. Robinson ("Robinson"), Robert A. Wayne ("Wayne"), Joseph P. La Sala ("La Sala") and Thomas D. Ruane ("Ruane") are among the twelve present partners of RW & L.

Defendant Ronald J. Riccio ("Riccio") is a former partner of RW & L who left the firm in 1988 to become Dean of Seton Hall University School of Law. Defendant John D. Arseneault ("Arseneault") is also a former partner of RW & L.
[2] Levin's present attorneys stated in a May 1, 1990 letter:

"As the senior tax partner in the firm, Mr. Levin was somewhat more involved with `the numbers' of both the firm and the individual partners than was the average partner."
[3] Levin's present attorney denied being involved in any improper conduct by saying that his "first involvement in this case was literally a week before the first letter (of April 4, 1990)."
[4] In the May 1, 1990 letter, Levin's attorney now adopts the previously discredited valuation report, as follows:

"[Mr. Levin's divorce] gave him the opportunity (albeit compelled by Rules of Court) to become involved in the evaluation of the firm. He was also confronted with a very conservative, but largely irrefutable, valuation of his percentage interest in the firm that was in excess of $250,000.00. This was a valuation done by a highly respected and regarded lawyer/CPA, Joseph Aronson, over a year and a half prior to the point in time when Mr. Levin was forced to leave."
[5] Levin's present lawyer says that Levin did not know when he came to his present lawyer "if there is no signed (partnership) agreement that there may be no written agreement" or "that these restrictive covenants were invalid."
[6] Defendants suggest that "the very close timing between the conclusion of his divorce action and the retention of plaintiff's present attorneys to pursue this action suggests that plaintiff may be engaged in an intentional fraud of the court."
[7] Levin's present attorney has acknowledged that if he is successful in this action, Levin's wife would have no interest in the award because his interest in the partnership was settled under a quid pro quo basis.
[8] Levin's certification states only that Mrs. Levin waived any claims to Levin's law practice, and that Levin has not concealed that asset from his ex-wife. The transcript of the terms of the divorce settlement contains a reference only to Mrs. Levin's testimony stating that she is waiving all claims to Levin's law practice. Contrary to the assertions in Levin's brief, which are not supported by Levin's certification, these matters evidence the benefit which Levin obtained in the prior proceeding.
[9] A lawyer shall not participate in offering or making:

(a) a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or
(b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties.
[10] Defendants argue that, in any event, this provision does not restrict a withdrawing partner from doing business with any clients (as did the agreement in Dwyer v. Jung, supra) or from practicing law in a certain location, but merely provides that a withdrawing partner will receive the same base benefits as other withdrawing partners who have less seniority but who will not practice law in the same city as the partnership. This provision is in the nature of "severance pay" in that it continues the weekly salary for an additional 30 rounds (i.e., six months of salary or draw at 5 rounds per month). The only "restriction" in this Partnership Agreement is that the severance pay will not be paid if the departing partner goes into private practice in Newark, in which event no severance pay would be payable to the departing partner. There is no restriction or penalty on former RW & L clients following departing partners. What it does in certain limited circumstances, is put a voluntary withdrawing partner with less seniority into the same position as an involuntary withdrawing partner.