660 A.2d 1287

NORTH JERSEY SAVINGS AND LOAN ASSOCIATION,
PLAINTIFF, v. FIDELITY AND DEPOSIT COMPANY
OF MARYLAND, DEFENDANT.

Superior Court of New Jersey
Law Division

Decided July 26, 1993.

58

*Daniel Kinburn,* for plaintiff (*Williams, Caliri, Miller & Otley,* attorneys).

*Ian A.L. Strogatz,* and *David I. Bookspan, (Wolf, Block, Schorr and Solis–Cohen,* attorneys) and *Robert P. Zoller (Hannoch Weis-man,* attorneys), for defendant.

ALTERMAN, J.S.C.

This is a motion for partial summary judgment.

The motion addresses Counts I and II of the complaint, alleging fraud and dishonesty of Landbank Equity Corporation, and of North Jersey Savings & Loan's Vice President, respectively. Other counts of the complaint have been severed and stayed.

On June 7, 1984, Fidelity & Deposit Company of Maryland (F & D) issued a Savings & Loan Blanket Bond to North Jersey Savings & Loan Association (North Jersey). This dispute addresses the applicability of the bond's provisions to losses sustained by North Jersey in its transaction with Landbank Equity Corporation (Landbank).

In the early 1980's, North Jersey determined to abandon its conservative lending philosophy and embark upon a new more aggressive investment strategy. To implement its new approach, North Jersey hired Neil Grote as its senior loan officer, and charged him with the responsibility of establishing a commercial real estate loan program.

In December 1984, through the brokerage of Premier Financial Group, North Jersey received an offer from Landbank to purchase $10,000,000 of first and second mortgage loans. According to the offer, Landbank promised to pay North Jersey a commitment fee of 1.5 percent, to pay a fixed-rate income stream of 13.75 percent, and to provide mortgages originated by Landbank which themselves were guaranteed against default by private mortgage insurance. Landbank also guaranteed to continue principal and interest payments for any loans if they became delinquent, until such time as the loan became current or was paid in full.

On December 19, 1984, Grote reviewed the offer with North Jersey's Board of Directors and the Board approved the transaction. As reflected in the Board's minutes, each second mortgage

"will have a second mortgage PMI [private mortgage insurance] policy covering 100 percent of the mortgage proceeds. The insurance company will have a Best Rating of AA and North Jersey Savings has the option to approve or disapprove any mortgage insurance company." On that date, North Jersey sent Landbank its commitment letter containing the aforementioned terms.

On January 14, 1985, Landbank and North Jersey entered into a "Sales and Servicing Agreement." Two days later, Grote, acting for North Jersey without express consent of the Board of Directors, modified the commitment letter to state that North Jersey would receive both first and second mortgages and that each "first and second mortgage will have a mortgage PMI insurance policy covering 100 percent of the mortgage proceeds underwritten by the Insurance Exchange of the Americas, Inc."

Responsibility for implementing, funding and monitoring the purchase was given to North Jersey's Assistant Vice President, Frank Rotella. He formulated underwriting guidelines for the mortgages and delegated responsibility for funding and loan-file processing to his subordinates.

Before North Jersey actually purchased any mortgages from Landbank, Balboa Insurance Company (Balboa), one of Landbank's private mortgage insurers, notified North Jersey that irregularities existed in Landbank-originated mortgages. The Balboa letter and other letters accompanying it, indicated inappropriate loan-to-value ratios of Landbank-originated mortgages, the possibility of violations of the Federal Truth In Lending Act, and possible violations of Virginia state law. Upon learning of those warnings, Grote instructed Rotella to suspend implementation of the Landbank transaction until Rotella confirmed that the mortgages to be purchased by North Jersey were fully covered by private mortgage insurance. Grote refused to authorize Rotella to proceed with the Landbank transaction until he received written confirmation from the Insurance Exchange of the Americas, Inc. that each mortgage to be included in North Jersey's mortgage package was fully covered by the Insurance Exchange's private

mortgage insurance. Grote also obtained the advice of Stanley Briggs, an insurance agent relied upon by North Jersey's employees, that the Insurance Exchange of the Americas was a coalition of insurance companies all with Best AA ratings. Then, satisfied with this insurance protection, Grote permitted North Jersey to proceed with the purchase of the Landbank mortgages.

Performance by Landbank during the first few months of the transaction was satisfactory. But by August 1985, Landbank was two months in arrears in its payments and North Jersey reported the default to its attorney and to the Insurance Exchange of the Americas. Landbank was unable to cure its default, and in September North Jersey took its mortgage from Landbank and turned the mortgage files over to Johnson Mortgage Company for servicing. It also notified F & D of a "possible loss under the Bond" and expressed its belief that "monies collected from mortgages had been misappropriated by Landbank for other uses."

In that same month, Landbank filed in bankruptcy. Shortly thereafter, a number of class action suits were filed by Landbank's mortgage borrowers against Landbank and its investors, claiming that Landbank-originated mortgages were unenforceable because of Landbank's violations of various federal and state laws. Resultingly, extensive civil and criminal litigation took place in several jurisdictions, culminating, in part, with the imprisonment of Landbank's officers and attorney. North Jersey's denunciation of Landbank as "a criminal racketeering enterprise" is more than mere hyperbole.

North Jersey asserts that F & D is required to reimburse it for losses it sustained in the Landbank transactions under several provisions relating to employee fidelity, to loss caused by servicing contractors, and to loss resulting from fraudulent mortgages.

## I.

### FIDELITY COVERAGE

North Jersey contends that Grote was a dishonest employee and that his improbity is evidenced in several ways.

First, he altered the agreement between North Jersey and Landbank without the Board's permission. The Board resolution required a private mortgage insurance company which was Best AA rated. Grote deleted that requirement from the commitment letter and agreed with Landbank that private mortgage insurance would be provided by Insurance Exchange of the Americas. Additionally, although the Board required that Landbank name North Jersey as an insured in its fidelity policy, Grote deleted that requirement from the commitment letter and merely required Landbank to request an endorsement to this effect.

Second, Grote knew, but failed to disclose to the Board and to his immediate supervisor, that Premier Financial Group was the broker for the Landbank transaction. North Jersey had received information from federal regulators to be cautious of transactions brokered by Premier Financial.

Third, when Grote received the correspondence from Balboa indicating that North Jersey's loans may not be insured by Balboa, or might not be insurable, he took no action except to verify that Insurance Exchange of Americas, rather than Balboa, insured North Jersey's loans.

Fourth, Grote failed to underwrite the Landbank loans.

In response to these contentions, F & D argues that Grote believed he was authorized to accept changes in the commitment letter and believed the changes were proper. The commitment letter was changed from "the [PMI] Insurance Company, must have a Best AA rating, and North Jersey S & L Association has the option to approve or disapprove any mortgage insurance company" to "each first and second mortgage will have a mortgage PMI insurance policy covering 100 percent of the mortgage proceeds underwritten by the Insurance Exchange of the Americas."

Federal regulators, F & D contends, did not instruct North Jersey to refrain from doing business with Premier Financial; they merely advised North Jersey about bad commercial loans

Premier Financial had brokered. The federal regulators had advised North Jersey that Premier Financial was a reliable broker of first and second residential mortgages, the kind of mortgages North Jersey was purchasing from Landbank. When Grote received the Balboa correspondence, he suspended implementation of the transaction until an arrangement had been made to provide insurance coverage for the mortgages North Jersey was about to purchase. Furthermore, Rotella, not Grote, had the obligation to underwrite the loans and they were in fact underwritten.

For the purpose of this motion, plaintiff's factual allegations are accepted as true.

F & D's bond provides for indemnification for:

(A) Loss resulting directly from dishonest or fraudulent acts of an Employee committed alone or in collusion with others.

(B) Dishonest or fraudulent acts as used in this insuring agreement shall mean only dishonest or fraudulent acts committed by such employee with the manifest intent

(a) to cause the Insured to sustain such loss, and

(b) to obtain financial benefit for the Employee or for any other person or organization intended by the Employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit-sharing, pensions, or other employee benefits earned in the normal course of employment.

This clause permits recovery where three conditions are satisfied: the employee's action must be dishonest or fraudulent; the employee must act with a "manifest intent" to cause the injury to his employer; and the employee must receive compensation not normally received in the ordinary course of business as part of his employment. *FDIC v. St. Paul Fire & Marine Ins. Co.*, 942 *F*.2d 1032, 1034 (6th Cir.1991).

"Manifest" is defined as "to show plainly or make palpably evident or certain by showing or displaying...." *Webster's Third New International Dictionary* (1986). The fidelity bond requires "manifest intent", an intent that is "apparent or obvious." *Hanson PLC v. National Union Fire Ins. Co.*, 58 *Wash.App.* 561, 794 *P*.2d 66, 72 (1990). A secret intent is of no consequence.

The "manifest intent" language was adopted by the fidelity insurance industry in 1976 in an effort to eliminate confusion over the definition of "dishonest and fraudulent acts." *Hartford Acc. & Indem. Ins. Co. v. Washington Nat'l Ins. Co.*, 638 *F.Supp.* 78, 81 (N.D.Ill.1986). Since that clause was added to the bond, the courts have required that a dishonest or fraudulent act must be committed with both the manifest intent to cause the employer to suffer the loss sustained and with the manifest intent to obtain a financial benefit for the dishonest employee or another. The certifications, depositions and other proof filed on this motion fail to adequately support the "manifest intent" elements.

North Jersey concedes that Grote did not act to obtain a financial benefit for himself. And it is not apparent or obvious that Grote intended to cause a loss to North Jersey, or intended by his conduct to financially benefit any third person.

Courts that have considered this issue have concluded, in factual constellations far more aggravated than presented here, that a jury question is not presented. *Leucadia, Inc. v. Reliance Ins. Co.*, 864 *F.*2d 964 (2d Cir.1988), *cert. denied*, 490 *U.S.* 1107, 109 *S.Ct.* 3160, 104 *L.Ed.*2d 1023 (1989), presents an exaggerated circumstance. Leucadia was in the business of factoring and investing. It contended that it sustained substantial losses resulting from the dishonest and fraudulent acts of Edward Helmke, the head of its mortgage loan department. Leucadia charged that in the course of transactions with three customers, Helmke inappropriately returned personal guarantees, over-represented the value of realty on which loans were based, failed to inform the senior credit committee that a customer who was in default on his loans realized and retained $310,000 on the settlement of a claim against a tenant whose lease had been assigned to Leucadia, made additional advances on loans already in default, failed to obtain collateral which he represented he would secure, knowingly accepted a worthless deed in exchange for release of a customer's personal guarantee, and made loans without authority or without collateral. At trial, Helmke did not dispute these assertions, but offered an

explanation for each of them. On appeal, the court held that the record failed to show that Helmke committed any acts of dishonesty with the manifest intent either to cause the insured to sustain a loss or to obtain financial benefit for himself or others.

In *First Fed. Savings & Loan Ass'n v. Transamerica Ins. Co.*, 935 *F.*2d 1164 (10th Cir.1991), the bank suffered a loss when its loan officer, in violation of bank policy, approved residential loans without loan committee approval. The bank sought to recover its loss under its fidelity bond. The court sustained a summary judgment in favor of the bonding company, because there was no evidence that the employee manifestly intended either to cause a loss to his employer or to obtain a financial benefit for himself or others.

In *Glusband v. Fittin Cunningham & Lauzon, Inc.*, 892 *F.*2d 208 (2d Cir.1989), Starbuck, the owner of an investment management corporation, obtained investment funds by falsely promising his investors he would follow a program of conservative investments. Instead, he employed an often reckless policy and made risky investments which he concealed from investors by misrepresenting the condition of their accounts. There was no evidence, however, that Starbuck either converted or intended to convert his customers' funds to his own use. His sole gain was in the form of salary or commissions. Reversing the jury's finding of liability under the bond, the court held that as a matter of law, the evidence was legally insufficient to support a finding of manifest intent. Rather, the evidence indicated that Starbuck intended to benefit his employer "no matter how reckless and imprudent his conduct may have been." *Id.* at 210.

A summary judgment was affirmed in *Municipal Sec., Inc. v. Insurance Co. of N. Am.*, 829 *F.*2d 7 (6th Cir.1987) where a bond trader exceeded by $54,000,000, the inventory limit placed upon her by her employer, and attempted to conceal her violation by submitting deceptive reports. The employee's "manifest intent" was to make money, not to cause her employer to lose money.

She intended to violate her standing orders, to be sure, but not for the purpose of causing a huge loss. *Id.* at 9.

Summary judgment was also granted under the "manifest intent" language in *Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co.*, 741 *F.Supp.* 515, *reconsideration denied*, 744 *F.Supp.* 1311 (D.N.J.1991), where Oritani's Vice President, in violation of bank policy, arranged to wire transfer funds without verifying account balances; and in *Verex Assurance, Inc. v. Gate City Mortgage Co.*, 1984 WL 2918 (D.Utah), where three loan officers entered into a scheme to obtain commissions by falsifying applications of persons with questionable credit.

■ Although in each of these cases, the employee exceeded his authority, there was no additional evidence to establish that his motive was to cause a loss to his employer. Here, Grote deviated from the terms of the agreement approved by North Jersey's Board of Directors. Arguably, the modified terms were worse than the terms approved by the Board. Perhaps Grote used poor judgment in proceeding with the transaction in light of the Balboa correspondence or in failing to inform the Board that the transaction was brokered by Premier Financial. Yet, there is no other evidence to suggest that Grote committed these acts for the purpose of causing a loss to North Jersey. Rather, his conduct is consistent with an attempt to benefit North Jersey by promoting an aggressive investment program in furtherance of his employer's general policy and by attempting to protect North Jersey's investment with satisfactory insurance coverage.

■ North Jersey's assertion that Grote intended to benefit Landbank or Premier Financial likewise has no support on the record. North Jersey contends that this element of manifest intent is found in Premier Financial's receipt of a broker's fee (although there is no evidence that such a fee was paid) and in Landbank's profits from the origination and servicing of the loans. Under the bond, the financial benefit obtained by the employer or third person must produce some financial benefit other than "commissions, [or] fees : .. earned in the normal course of em-

ployment." There is nothing to suggest that Landbank or Premier received any financial benefit other than that obtained in the normal course of their businesses. Even fees and commissions improperly obtained may not be considered financial benefits under this provision of the bond. *See, e.g., Municipal Securities, Inc. v. Insurance Co. of N. Am., supra; Verex Assurance Inc. v. Gate City Mortgage Co., supra.*

North Jersey relies on *First Nat'l Bank v. Lustig,* 961 *F.*2d 1162 (5th Cir.1992) and *Liberty Nat'l Bank v. Aetna Life and Cas. Co.,* 568 *F.Supp.* 860 (D.N.J.1983), for the proposition that Grote's intent to cause a loss may be inferred from his recklessness and from the loss itself. Those cases are not apposite. In each of those cases there was evidence of a personal relationship between the allegedly dishonest bank employee and the loan recipient. In *First National Bank,* the employee falsified credit records, falsified loan related documents, obtained a substantial loan from the customer he favored after he left the bank's employ, and pleaded guilty to a criminal offense. In *Liberty,* the employee withheld information from his Board of Directors, lied to his directors and falsified minutes of the meeting in which the loans were discussed. Grote's conduct does not remotely approach the conduct of the employees in these cases. The conduct which North Jersey characterizes is reckless, but clearly reveal elements of peccability.

The evidence adduced by North Jersey fails to raise a genuine issue of material fact with respect to either Grote's intent to cause a loss to the bank or to financially benefit a third party. The summary judgment procedure is designed to "avoid trials which would serve no useful purpose, and to afford deserving litigants immediate relief." *Warthen v. Toms River Community Mem. Hosp.,* 199 *N.J.Super.* 18, 23, 488 *A.*2d 229 (App.Div.), *certif. denied,* 101 *N.J.* 255, 501 *A.*2d 926 (1985). The judgment is to be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to judgment as a matter of law. *R.* 4:46–2.

Where the moving party demonstrates a prima facie right to summary judgment, the opponent of the motion is required to show by competent evidence that a genuine issue of material fact exists. *E.g., Robbins v. Jersey City,* 23 *N.J.* 229, 128 *A.*2d 673 (1957); *Ash v. Frazee,* 37 *N.J.Super.* 542, 547–48, 117 *A.*2d 634 (App.Div.1955). The opponent's papers must be treated indulgently and must receive every favorable inference. *Judson v. Peoples Bank & Trust Co.,* 17 *N.J.* 67, 74–75, 110 *A.*2d 24 (1954).

Where subjective states of mind are an issue, *i.e.,* fraud, intent, motive, our courts deal cautiously with motions for summary judgment. *Id.* at 76, 110 *A.*2d 24; *Shanley & Fisher, P.C. v. Sisselman,* 215 *N.J.Super.* 200, 212, 521 *A.*2d 872 (App.Div.1987). Nevertheless, there are circumstances in which summary judgment is granted even though a state of mind is in issue. *Exxon Corp. v. Wagner,* 154 *N.J.Super.* 538, 541, 382 *A.*2d 45 (App.Div. 1977); *Barbetta Agency, Inc. v. Evening News Pub. Co.,* 135 *N.J.Super.* 214, 223, 343 *A.*2d 105 (App.Div.1975); *Falcone v. Branker,* 135 *N.J.Super.* 137, 153, 342 *A.*2d 875 (Law Div.1975). This is such a case.

The circumstances that North Jersey advances to establish Grote's manifest intent to cause a loss to the Bank and to benefit another find no support in the evidence. Grote arranged for private mortgage insurance covering North Jersey's investments with a company he was informed met the standards established by the Board of Directors. When he received information that suggested caution, he delayed the transaction until he was satisfied that his employer was protected. There is nothing more than conjecture to support the allegation that he acted fraudulently or dishonestly.

## II.

### SERVICING CONTRACTOR'S RIDER

North Jersey advances two theories under which coverage is provided pursuant to the Rider. It contends that because Land-

bank was its servicing contractor, the bond reaches all losses resulting from Landbank's conduct, even though that conduct did not relate to the performance of Landbank's duties of the servicing contractor. It also contends that the Rider extends to losses resulting from false representations made by Landbank to North Jersey and its failure to remit monies it collected.

### A. *Performance as a Servicing Contractor.*

■ The Servicing Contractor's Rider to the bond extends coverage to:

> "A Loss through any dishonest or fraudulent act committed by any servicing contractor, as hereinafter defined, acting alone or in collusion with others.
>
> Dishonest or fraudulent acts as used in this insuring agreement shall mean any dishonest or fraudulent acts committed by such servicing contractor with the manifest intent:
>
> (a) to cause the insured to sustain such a loss; and
>
> (b) to obtain financial benefit for the servicing contractor, or for any other person or organization intended by the servicing contractor to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit-sharing, pensions, or other employee benefits earned in the normal course of employment or performance of the servicing contract."
>
> A "servicing contractor" is a person, partnership or corporation authorized by the insured to collect and receive payments on real estate, mortgage or home-improvement loans held or assigned to the insured, to establish tax and insurance escrow accounts, and to perform other directly related act, "but only while such natural person, partnership or corporation is actually performing such services...."

North Jersey contends that the fraud or dishonesty required to recover under the bond was any fraud or dishonesty of Landbank and need not have been any fraud or dishonesty resulting from its duties as a servicing contractor. That is to say, that once Landbank became a servicing contractor, its fraud or dishonesty is covered by the bond in whatever capacity it was engaged when the dishonest act was committed.

The Servicing Contractor's Rider affords coverage resulting from a dishonest or fraudulent act of a servicing contractor, when there is a manifest intent to cause the insured to sustain a loss or to obtain a financial benefit for itself other than that earned in the normal course of employment while servicing the contract. The

language of the Rider is virtually identical to the language employed in the fidelity coverage included in the body of the bond.

In this transaction, Landbank acted in several capacities. It originated the mortgages (loaned money and received the mortgages as security on the loans); it packaged the mortgages into pools which it sold to investors such as North Jersey; and it serviced the mortgages for the investors to whom the mortgage pools were sold. North Jersey alleges that Landbank's fraud and dishonesty are reflected in its inflated mortgage appraisals, its insider loans designed to disguise its own speculative ventures, its violations of state and federal statutes in obtaining the mortgages, its submission of fraudulent service reports to conceal the extent of defaults on its loans, its failure to notify North Jersey of foreclosures by other lienors on mortgaged property, its concealing the fact that Insurance Exchange of the Americas' policies of insurance were worthless, and its failure to remit collections of mortgage payments to North Jersey.

With the exceptions of making false returns on monies purportedly collected for North Jersey and failing to remit those amounts, these allegations of fraud and dishonesty relate to Landbank's conduct as originator and packager of the mortgages, as distinguished from its conduct as a servicing contractor.

■ North Jersey contends that, at least, the bond is ambiguous and under accepted principles of insurance law must therefore be read in favor of North Jersey. *Sparks v. St. Paul Ins. Co.,* 100 *N.J.* 325, 336, 495 *A.*2d 406 (1985). The principle applies to blanket bonds of the kind here under consideration. See, *Fidelity & Deposit Co. v. Hudson United Bank,* 653 *F.*2d 766, 772 (3d Cir.1981); *Midland Bank & Trust Co. v. Fidelity Co.,* 442 *F.Supp.* 960, 969 (D.N.J.1977).

■ The doctrine of reasonable expectations, however, is applied only when the language of the policy is so confusing that the average policyholder cannot understand the boundaries of coverage. *Weedo v. Stone–E–Brick, Inc.,* 81 *N.J.* 233, 246–47, 405 *A.*2d

788 (1979). The doctrine does not require a strained construction to impose liability or to write a better policy than the one purchased. *Longobardi v. Chubb Ins. Co.*, 121 *N.J.* 530, 537, 582 *A.*2d 1257 (1990). To interpret this bond as expansively as North Jersey contends, is to ignore the unambiguous definition of a "servicing contractor" and particularly the subordinate clause of the definition. The Rider amends the bond by adding to it an undertaking to provide coverage for the dishonest and fraudulent conduct of a "servicing contractor." The definition of "servicing contractor" restricts that coverage to a servicing contractor "while actually performing such services...." This clause clearly and unambiguously limits coverage for the defaults of a servicing contractor to those instances in which the servicing contractor is actually collecting monies, recording the collections, and performing related acts. The language does not permit an interpretation that the Rider covers the conduct of a servicing contractor when it is performing services of some other kind or acting in some other capacity—even in the same transaction.

It is coincidental, only, that in this transaction the originator of the mortgage and the servicing contractor are one. To elevate that coincidence to a reasonable expectation would violate even the special rules governing interpretation of insurance policies.

*Maryland Cas. Co. v. First Nat'l Bank*, 246 *Fed.* 892 (5th Cir.1918) and *Employers' Liab. Assur. Corp., Ltd. v. Reed's Refrig. Serv.*, 222 *Md.* 49, 158 *A.*2d 616 (1960), cited by North Jersey, are not analogous. In each of those cases, an employee committed an act of dishonesty not connected with his specific employment. The definition of employee in the bonds involved there, however, is less precise than the definition of "servicing contractor" here, where coverage is extended only while the servicing contractor is actually performing the services rendered by a servicing contractor. That language is not contained in the bonds issued in either of the cases cited by North Jersey.

In the *Maryland Casualty Co.* case, the bank sustained a loss when it paid out monies on its employee's overdrawn checking

account. The bond required the insured to reimburse the bank for the loss it sustained "by reason of any act or acts of Fraud, Dishonesty, Forgery, Embezzlement, Wrongful Abstraction, or Willful Misapplication on the part of an employee (while in any position in the service of the Employer and committed directly or through connivance with others) named in the schedule hereto attached...." Interpreting this language, the court held that coverage was not limited to the service for which the employee had been employed.

The employee in the *Reed's* case cashed a bad check for $600 through her employer's cashier. The language in the bond, however, was abundantly clear. It required indemnification of the bank for all losses sustained "through any fraudulent or dishonest act or acts, committed by any of the Employees acting alone or in collusion with others."

The language of the bonds in these two cases is in stark contrast to the language in the F & D Bond, which limits coverage to instances while the servicing contractor "is actually performing" the services listed in the definition of "servicing contractor."

### B. *False Representations.*

North Jersey advances a second argument in support of coverage under this Rider, *e.g.,* that even if the bond covers the servicing contractor only while actually performing its collecting function, Landbank's misrepresentation that it was an Federal National Mortgage Association (FNMA) servicer, that it would provide FNMA documentations, and that it would service in accordance with good practices, are misrepresentations and therefore dishonest or fraudulent acts covered by the bond. Assuming that Landbank made these representations and had the duty to disclose to North Jersey that these representations were false, the issue still remains whether that dishonest or fraudulent conduct was committed with a manifest intent to obtain a financial benefit for itself "other than salaries, commissions, fee, bonuses ... or other employee benefits earned in the normal course" of its employment.

The interpretation of "manifest intent" is defined in the servicing contractor's rider in the same way it is defined under the insuring agreement providing for fidelity coverage. It requires a "manifest intent" by the servicing contractor to cause a loss to the insured and to obtain a financial benefit for itself or another.

*Mortell v. Insurance Co. of N. Am.*, 120 *Ill.App.*3d 1016, 76 *Ill.Dec.* 268, 458 *N.E.*2d 922 (1983), dealt with a salesman in a commodities brokerage firm. Customers sued the firm for losses sustained by reason of false representations made to them. The firm settled many of those claims and then commenced a declaratory judgment action against its fidelity bond. Although the salesman received commissions from his fraudulent trades, summary judgment in the bonding company's favor on this issue was sustained because the financial benefit they received were commissions earned in the normal course of employment, even though the commissions resulted from unauthorized trading.

In *Benchmark Crafters, Inc. v. Northwestern Nat'l Ins. Co.*, 363 *N.W.*2d 89 (Minn.Ct.App.1985), a salesman submitted false orders to his employer, but earned no more than his regular salary and expenses from his fraudulent acts. The court held that there was no coverage for this loss under the bond because the "financial benefit" element of the policy had not been satisfied.

Similarly, in *Berger v. Fireman's Am. Loss Control Co.*, No. 82–508, slip op., (Md.Ct.Spec.App. Dec. 16, 1982), an automobile salesman fraudulently led his employer to believe that he had leased 150 automobiles. The salesman was paid a draw against commissions. The court concluded that there was no coverage under the bond because the salesman gained only the financial benefits which he would have earned had he acted honestly. Again, *Verex Assurance, Inc. v. Gate City Mortgage Co., supra,* three loan officers of a mortgage company falsified application information and granted loans to persons of doubtful credit in order to collect commissions on those loans. The court held, absent any evidence that the loan officers intended to cause a loss or obtain a financial benefit other than commissions, that the loss

from that scheme was not covered by the dishonest employee provisions of the fidelity bond.

There is no reason to interpret the language in the Servicing Contractor's Rider any differently than the almost identical language in the fidelity coverage provisions of the bond. The inquiry, then, is whether North Jersey has shown that Landbank, as a servicing contractor, would receive financial benefits other than those it would have earned had it performed the services for which it contracted.

Landbank's profit from the transaction was the difference in the interest rate it was receiving on the mortgages it sold (18 percent) and the interest rate it agreed to pay to North Jersey (13.75 percent). If Landbank had not collected the mortgage payments from its borrowers, it merely impoverished itself—it did not receive the percentage difference that represented its profit in the transaction. Hence, by performing as a servicing contractor, Landbank merely gained the benefit it already contracted to receive. By failing to service, it was committing financial suicide. See, *FDIC v. St. Paul Fire & Marine Ins. Co.*, *supra*, 942 *F*.2d at 1035–36. Moreover, Landbank was receiving a fee from North Jersey for servicing the mortgages. That fee, likewise, is excluded from the definition of "financial benefit", because it is a fee which Landbank would be entitled to receive had it received the services it contracted to perform for North Jersey.

The alleged false representations made by Landbank do not evoke coverage under this bond. Even assuming, as North Jersey argues, that Landbank as a service contractor had an obligation to disclose its earlier misdeeds or that it had an obligation as agent of North Jersey to disclose those misdeeds, coverage is still not occasioned. The failure of Landbank to disclose, in its capacity as a servicing contractor or as an agent, only allows it to continue to obtain the salaries, commissions and fees it was entitled to receive under its agreement. Again, the cases interpreting this language do not require that the commissions and fees be earned honestly.

■ It is F & D's contention that under these provisions, the bond was cancelled at the time North Jersey learned, through either Grote or Rotella, that Landbank was guilty of violations of federal and state Law. The complaint alleges that prior to North Jersey's funding the purchase of the Landbank mortgages and prior to their delivery, Grote received the Balboa letter which indicated "multiple violations of State and Federal Law committed by Landbank and involving Truth In Lending, usury, excessive closing costs and the like." North Jersey did not advise F & D of this disclosure. Rather, it elected to proceed with the transaction after it had disclosed the information to its insurer, EIA, and EIA agreed to provide full guarantees of the loans. Mere suspicions of irregularities or improper conduct did not require North Jersey to report those acts. *American Surety Co. of New York v. Pauly,* 170 *U.S.* 133, 144, 42 *L.Ed.* 977 (1898). The Balboa letter disclosed inefficiencies, irregularities or discrepancies in accounts. Subsequent events reveal that Landbank's conduct was indeed fraudulent, but hindsight cannot transform suspicion of dishonesty into knowledge of dishonesty. *See, e.g., Midland Bank & Trust Co. v. Fidelity & Deposit Co.,* 442 *F.Supp.* 960, 972 (D.N.J.1977).

The Balboa letter expresses the writer's deep concern about the propriety of Landbank's handling of mortgage loans and the serious nature of the violations. It does not accuse Landbank of dishonesty or fraud. It would be unwarranted, at that juncture, to conclude that the Balboa letter justified North Jersey or its employees in concluding that Landbank was guilty of a dishonest and fraudulent act. The individual who examined the Landbank documents did not express that opinion. A prudent person would not reach that conclusion without, at least, examining the same evidence that had been examined by the author of the letter. The circumstances are not sufficient to trigger the automatic cancellation clause.

### C. *Failure To Remit.*

■ North Jersey alleges that Landbank failed to remit monies it collected from June through September 1985, and that it

also failed to remit monies received on mortgages that were paid in full by the mortgagors.

> The Servicing Contractor's Rider also extends coverage for Loss of money.... collected or received for the Insured by any such Servicing Contractor through the failure of such Servicing Contractor to pay to the Insured the Money so collected or received....

Recovery under this provision is, however, precluded by specific exclusions contained in the Rider. Paragraph 2(b) excludes losses resulting from the failure of the servicing contractor to collect or receive money for the account of the insured. Paragraph 2(c) excludes loss of money collected by the servicing contractor unless the servicing contractor is legally liable to the insured on account of that loss.

Under its agreement with North Jersey, Landbank was obligated to pay to North Jersey 13.75 percent interest on the mortgages purchased by North Jersey, whether or not Landbank could collect mortgage payments from the mortgagors. Landbank warranted that "the timely pass-through of principal and interest to [North Jersey] whether collected or not, shall continue indefinitely...."

Accordingly, any loss sustained by North Jersey resulting from Landbank's failure to remit monies Landbank may have collected or received from its mortgagors falls within exclusion 2(c). Landbank did not, under the terms of its contract, collect or receive funds for North Jersey. It collected those funds for its own benefit, presumably to enable it to meet its obligation to pay North Jersey 13.75 percent of its investments. It was bound to pay the amounts represented by that percentage whether or not it made sufficient collections.

Under paragraph 2(c), North Jersey must establish that Landbank was legally liable for the loss. North Jersey is unable to produce any reliable evidence that Landbank collected monies that it did not remit. The trial balances and loan transaction histories on which North Jersey relies, have no adequate foundation. The deposition testimony of the manager of Landbank's computer

department reveals that fictitious payments were posted on Landbank's books and that Landbank had no control mechanism to track whether posted payments had in fact been made. North Jersey computed its loss by relying upon Landbank's records.

North Jersey has the burden of meeting the allegations of this summary judgment motion by competent evidence. *See, e.g., Robbins v. Jersey, supra; Ash v. Frazee, supra.* Reliance on Landbank's uncertain records cannot demonstrate what monies may have been collected, let alone what may have been collected for North Jersey's account.

## III.

### TRADING LOSS PROVISION

 The "trading loss" exclusion of the bond excludes coverage for "losses resulting directly or indirectly from trading...." Trading losses are understood to be "market losses sustained by firms as a result of ill-advised, unauthorized, or simply unlucky trading decisions made in the purchasing, selling or trading of securities." *Insurance Co. of N. Am. v. Gibralco, Inc.,* 847 F.2d 530, 533 (9th Cir.1988). A "security" as defined by the bond is an instrument which has the following four characteristics: (1) it is issued in bearer or registered form; (2) it is of the type commonly dealt in upon securities exchanges or market or markets; (3) it is either one of a class or series, or by its terms is divisible into a class or series of instruments; and (4) it evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer.

It is clear that a mortgage or mortgage pool is not a security under this definition. Neither the mortgages, individually or in pool, are issued in bearer or registered form; there is no evidence that the mortgages or mortgage pools are commonly dealt with as a security on any securities exchange, or are divisible into a class or series. Because the mortgages or mortgage pools do not have

the requisite characteristics of a security, they ordinarily would not fall within the trading loss exclusion of the bond.

However, North Jersey has previously taken the position that the mortgage pools were securities. North Jersey was one of several plaintiffs in a declaratory judgment action against Landbank and a number of insurance companies. In that complaint, plaintiffs designated themselves as "investors and purchasers of mortgage securities." North Jersey specifically alleged that it had "purchased mortgage securities representing interests in excess of six hundred (600) mortgages in pools...."

The complaint also alleged the purchase of "mortgaged-backed securities," or "mortgaged securities," and that the transaction was a "security" under the federal law. In its memorandum in the federal district court in which that action was pending, plaintiff explained that it "purchased individual interests in pools of mortgages sold under investment contracts issued by Landbank"; that Landbank "continued to manage the pool mortgages for the investors"; that these "were undivided interests in pools of mortgages sold under the investment contracts"; and it argued specifically that the mortgage securities are securities under the definition of the Exchange Act and the Securities Act, citing *SEC v. W.J. Howey Co.*, 328 *U.S.* 293, 66 *S.Ct.* 1100, 90 *L.Ed.* 1244 (1946) in *United Housing Found., Inc. v. Forman*, 421 *U.S.* 837, 95 S.Ct. 2051, 44 *L.Ed.*2d 621 (1975).

That litigation was settled and the court did not decide whether the mortgaged-backed securities satisfied the statutory definition of securities in those acts.

▮▮▮ Nevertheless, having argued that these mortgaged-backed pools are "securities" in its action in the federal district court, North Jersey cannot now take a contrary position and argue in this court that what it received from Landbank is not a security. New Jersey courts have adopted the principle of judicial estoppel. The doctrine bars a party to a legal proceeding from arguing a position inconsistent with one previously asserted. *N.M. v. J.G.,*

255 *N.J.Super.* 423, 426, 605 *A.*2d 709 (App.Div.1992). The doctrine applies whether the position first assumed was successful or unsuccessful, *AFN, Inc. v. Schlott,* 798 *F.Supp.* 219 (D.N.J.1992), whether the parties are identical or not, and whether the inconsistency relates to a factual or legal position. *Levin v. Robinson Wayne & La Sala,* 246 *N.J.Super.* 167, 184–85, 586 *A.*2d 1348 (Law Div.1990) (citing *Hardwick v. Cuomo,* 891 *F.*2d 1097, 1105 n. 14. (3d Cir.1989)). North Jersey does not deny that in the federal district court, it contended that the mortgage pools were "securities." It argues only that causes of action based on other theories were also alleged and that the claims were not adjudicated but were settled without the basis of the settlement being specified. North Jersey also urges that the doctrine would not apply where the inconsistencies are not intentional and would not work an injustice.

It is difficult to understand how, in these circumstances, inconsistent positions can be taken unintentionally. But even if they were, there is no good faith exception to the doctrine. "If courts were to entertain such claims of 'good faith mistake' (which would be difficult to refute because they could arguably be based on the claimant's internal, subjective state of mind), the doctrine of judicial estoppel would be emasculated or severely eroded, and, accordingly, its purpose subverted." *Levin v. Robinson, Wayne & La Sala, supra,* 246 *N.J.Super.* at 185, 586 *A.*2d 1348.

The doctrine bars North Jersey's claim under the "trading loss" exclusion of the Bond.

## IV

### FRAUDULENT MORTGAGE RIDER

The Fraudulent Mortgage Rider provides coverage for loss through the receipt of any mortgages "which prove to have been defective by reason of the signature thereon of any person having been obtained through trick, artifice, fraud or false pretenses...."

There is no evidence that these mortgages were defective by reason of the mortgagor's signature having been obtained through trick artifice, fraud or false pretenses. The allegation North Jersey makes is that the mortgages were the product of Landbank's intentional violations of the Truth In Lending statute and Regulation Z. There is a distinction, for purposes of resolving this issue at least, between a fraudulent scheme and a fraudulently induced signature. A mortgage may have been induced by fraudulent acts, but the signature may be valid. There are no allegations that the signatures on the mortgages purchased by North Jersey are invalid.

In *Jefferson Bank v. Progressive Cas. Ins. Co.*, 965 *F*.2d 1274 (3rd Cir.1992) the bank's blanket bond contained a Fraudulent Mortgage Rider to cover loan losses resulting from mortgages accepted in good faith, but which were defective by reason of the signature of the mortgagor having been obtained by trick, artifice, fraud or false pretenses. The court stated the Rider would cover bank losses "resulting when the seller of real property fraudulently induces the mortgagor to purchase the property and sign a mortgage by promising that the mortgage will never be enforced, by misrepresenting to the mortgagor that the mortgage covers a different piece of property or by telling the mortgagor that the document being signed was a contract of purchase rather than a mortgage." *Id.* at 1280. There is no evidence that any mortgagor of Landbank did not realize he was signing a mortgage. The complaints made against Landbank in the litigation against it related to Landbank's failure to fully or honestly disclose the terms of the loan and the rate of interest it charged.

Additionally, North Jersey's losses resulted from the overvaluation of the mortgaged properties, not because the mortgages obtained on those properties were somehow defective. They constituted valid liens and so did not fall within the meaning of the Fraudulent Mortgage Rider.

To bring this loss within this Rider, North Jersey has the burden to establish that the mortgagors did not know they were

signing a mortgage, or were caused to believe that the mortgage did not or would not have the effect of encumbering the property. This proof has not been adduced; nor has even the allegation been made. Absent this proof, there can be no recovery under this Rider.

## V.

### INDEMNIFICATION OF ATTORNEY FEES

■ Paragraph E of the General Agreements of the bond requires F & D to indemnify North Jersey against reasonable court costs and attorneys' fees incurred in defending actions against North Jersey if the loss or damage would be a covered· loss under the bond. North Jersey contends that the claims made against it in those actions, if proven, would have constituted collectible losses under the Servicing Contractor Rider and the Fraudulent Mortgage Rider.

Because North Jersey is unable to establish a loss falling within the coverages of these Riders, F & D is not required to indemnify it for its counsel fees and costs.

## VI.

### CONCLUSION

Accordingly, partial summary judgment is granted in favor of F & D and against North Jersey. The losses in Counts I and II of the complaint are not covered under the fidelity provision of the bond or under either the Servicing Contractor's or Fraudulent Mortgage Riders.

F & D will submit an order consistent with this opinion on five days' notice.