Re: FEDERAL DEPOSIT
INSURANCE CORP.,

v.

NATIONAL UNION FIRE
INSURANCE COMPANY
OF PITTSBURGH, PA.

No. CIV. A. 96–2575(NHP).

United States District Court,
D. New Jersey.

May 18, 2001.

Gerald A. Liloia, Keith A. Barrack, Riker, Danzig, Scherer, Hyland & Peretti L.L.P., Morristown, NJ, for Plaintiff.

William B. McGuire, Marianne M. DeMarco, Tompkins, McGuire, Wachenfeld & Barry, Newark, NJ, Robert E. Kushner, Stephen F. Willig, D'Amato & Lynch, New York City, for Defendant.

## THE ORIGINAL OF THIS AMENDED LETTER OPINION IS ON FILE WITH THE CLERK OF THE COURT

POLITAN, District Judge.

Dear Counsel:

This matter comes before the Court on a motion for summary judgment by Defendant, National Union Fire Insurance ("National Union" or "Defendant"). Oral argument was heard on March 16, 2001. For the reasons stated herein, Defendant's motion is **GRANTED**.

### STATEMENT OF FACTS [1]

In 1984, a large-scale construction project called Port Liberte' was launched on the Hudson River waterfront in Jersey City, New Jersey. The project contemplated use of 114 acres of land and the development of 2,250 residential units, one million square feet of commercial space, a town center, luxury hotel, marina, yacht club, restaurant, health club and individual boat slips for use by residents. It was to be built in five phases over the course of ten years. The project was owned and

---

1. The facts as set forth herein are primarily derived from Plaintiff's Rule 56.1 Statement of Facts and Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion, which generally accepts Defendant's recitation of facts as accurate.

developed by Port Liberte' Partners.[2] City Federal Savings Bank ("City Federal" or "the bank"), a federally chartered savings bank, provided a large portion of the funding for the Port Liberte' project. City Federal's principal place of business was in the Township of Bedminster, Somerset County, New Jersey.

Between June 1984 and November 1985, City Federal loaned approximately 16.5 million dollars to Port Liberte' Partners for the purpose of purchasing the land and securing the necessary permits and approvals for its development. In February 1986, City Federal approved a revolving construction loan (the "revolver") in an initial amount of fifty million dollars, which was increased to ninety million in December 1986.[3] Between March 1988 and February 1989, City Federal made nine additional loans to Port Liberte' Partners. These additional lending decisions by City Federal were based primarily on a report issued in April of 1988 by George Ward, the senior MAI appraiser for City Appraisal Services, Inc., a wholly owned subsidiary of City Federal. Compl., ¶ 26.

In March 1989, National Union issued to City Federal a financial institution bond, Bond Number 362 61 69. Generally speaking, the bond is an insurance policy. Among other things, the bond provided City Federal with fidelity insurance and would indemnify City Federal or its subsidiaries for up to twenty million dollars of losses caused by certain fraudulent or dishonest acts of City Federal employees. The bond language is narrowly tailored, however, and it is this specific language which is the crux of the matter at bar.

The terms of the bond will be discussed more thoroughly herein.

Plaintiff contends that the only reason the additional loans totaling $19,009,729 were made to the Port Liberte' project (on top of existing outstanding loans of approximately 150 million dollars) was because a bank officer, an executive vice president of City Federal, George E. Mikula, concealed critical information which, if disclosed, would have prevented the executive committee of City Federal's Board of Directors from authorizing the additional loan disbursements in 1988 and 1989. No part of the additional nineteen million plus was ever repaid or otherwise recovered by the bank.

Mikula was the primary City Federal officer responsible for the day-to-day administration and oversight of the bank loans to Port Liberte' Partners. It was his duty to keep the executive committee of the Board of Directors fully apprised of the status of the project. Mikula made presentations to the executive committee regarding the project and sought approval from the committee with respect to all loans to Port Liberte' Partners. Mikula was obligated to report to and advise the executive committee of all information of which he was aware that could impact the project or the loans for the project. At all times, however, the executive committee had the sole final responsibility and authority for all lending decisions.

In February 1989, the Office of Thrift Supervision ("OTS") began an examination of City Federal. The OTS found that the bank had substantial problems, one being

---

**2.** Port Liberte' Partners is a New Jersey Limited Partnership comprised of a general partner, the Spoerry Group, Inc., and five limited partners, one being Paul W. Bucha & Co., Inc., which is owned by Paul W. Bucha ("Bucha"). Bucha served as project manager for the Port Liberte' project.

**3.** Fourteen other financial institutions, including National Westminster Bank ("NatWest") participated in the revolver.

the management of the Port Liberte' loan, and concluded that City Federal was on the verge of failure. By April 1989, after City Federal had granted extensions for loan repayment, all loans to Port Liberte' Partners were in default. The other banks participating in the loans refused to extend any more credit to Port Liberte' Partners.[4] "[B]y early 1989, all persons affiliated with the bank, including the Members of the Executive Committee and the Board, were well aware that the project ... was in severe financial trouble." Pl. Rule 56.1 Statement, ¶ 33. Nevertheless, City Federal made five emergency advances, totaling $1,275,729, to Port Liberte' Partners from May to June of 1989. In addition, City Federal made three more loans to Port Liberte' Partners in July and August of 1989. These emergency advances and loans, totaling $19,009,729, were the subject of City Federal's claim under the National Union bond and are now the subject of the FDIC's Complaint here.

▮ On December 7, 1989, City Federal was declared insolvent by the Director of the OTS and the Resolution Trust Corporation ("RTC") was appointed receiver for City Federal. On December 31, 1995, the FDIC succeeded the RTC as receiver for City Federal.[5]

A formal proof of loss was filed by City Federal with National Union in February 1991. National Union denied City Federal's claim on April 27, 1994.[6] The FDIC filed this lawsuit against National Union on behalf of City Federal on May 31, 1996 claiming breach of contract and seeking declaratory relief in the amount of $19,009,729. The FDIC's Complaint alleges that Mikula was dishonest because he did not disclose to the bank's executive committee certain facts which would have impacted the bank's determination of whether to lend additional money to the Port Liberte' project.

The FDIC claims that Mikula intentionally concealed reports and appraisals in order to cause City Federal to sustain a loss and to obtain a financial benefit for himself or others. The parties agree, however, that Mikula has not benefitted financially from the loan transactions at issue. Plaintiff instead argues that Mikula obtained a financial benefit for a third party, namely Port Liberte' Partners and the subcontractors who performed work on the

4. Other banks were in fact demanding that foreclosure proceedings be instituted by City Federal, the lead lender, at that time.

5. The Port Liberte' loans are not the only transactions which caused the demise of City Federal. For example, the *RTC v. F & D* case cited throughout this opinion involved a different credit line approved by City Federal which also resulted in a major loss. Also, in July 1989, the Star Ledger reported on City Federal's non-performing loans, stating that the principal nonperformer was a loan extended for the construction of resort condominiums in Vero Beach, Florida. Def. Ex. Y.

Moreover, the Court takes judicial notice of the fact that the late 1980's and early 1990's was a time in history when the bottom fell out of the real estate market. *See, e.g.*, Saler, Alex E., "The Inherent Ambiguity of Commercial Real Estate Values," 13 Va. Tax Rev. 787,

788–798 (Spring 1994); Kane, Richard J., "Creative Real Estate Financing 1991: Finding Financing in Today's Economy," 371 PLI/Real 11, at *14 (1991). In fact, with its funding curtailed, and the RTC threatening to foreclose on the Port Liberte' loans, Port Liberte' Partners filed for Chapter 11 bankruptcy protection in January 1991. The Port Liberte' project was ultimately sold in two parts, one in 1994, the other in 1996. The project is now flourishing. But Port Liberte's bankruptcy filing and the OTS decision to take over City Federal were not atypical events in the real estate market and economy during this period.

6. Related litigation against the president of the bank, Rick Atherton, was carried out during that time period.

Port Liberte' project. *See* 3/16/01 Tr. at 17–19. This allegation is also set forth in the Complaint.

The following individuals may be referred to throughout this opinion. James McTernan was employed by City Federal from 1976 until June or July of 1989. McTernan was an executive vice president who reported directly to Rick Atherton.

Atherton was the bank president, CEO, and member of the Board of Directors. He was appointed as an executive committee member in June 1989. Alfred Hedden and John Kean were directors of City Federal and members of the executive committee at all relevant times. David Hermann was also an executive vice president of the bank.

## DISCUSSION

### A. Standard for Summary Judgment

The standard governing a summary judgment motion is set forth in Fed. R.Civ.P. 56(c), which provides, in pertinent part, that:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Procedurally, the movant has the initial burden of identifying evidence that it believes shows an absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the movant will bear the burden of proof at trial, the movant's burden can be discharged by showing that there is an absence of evidence to support the non-movant's case. *Id.* at 325, 106 S.Ct. 2548. If the movant establishes the absence of a genuine issue of material fact, the burden shifts to the non-movant to do more than "simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505 (finding that if the movant establishes that there is no genuine factual issue, "the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict.")

Evidence which is "merely colorable" is not sufficient to raise a factual issue when summary judgment would otherwise be proper. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

■ Indeed "Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to his case, and on which he will bear the burden of proof at trial." *Churchill v. IBM, Inc.*, 759 F.Supp. 1089, 1094 (D.N.J.1991)(*citing Celotex* 477 U.S. at 322, 106 S.Ct. 2548).[7]

---

7. It should be noted that where the FDIC sues on behalf of an insolvent bank, state law applies. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994); *Atherton v. FDIC*, 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997); *RTC v. F & D*, 205 F.3d at 626. Therefore, this Court must construe the bond language in accordance with the principles of New Jersey law.

## B. The National Union Bond

The financial institution bond at issue here provides coverage for:

Loss resulting directly from **dishonest or fraudulent acts** committed by an employee acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the employee with the **manifest intent:**

(a) to cause the insured to **sustain loss;** *and*

(b) to **obtain financial benefit** for the employee or another person or entity.

As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

Plaintiff's Exhibit Binder, Ex. A–34, Ex. A–41 (emphasis added).

This bond is virtually identical to the bond provision at issue in the fairly recent case of *Resolution Trust Corp. v. Fidelity & Deposit,* 205 F.3d 615, 635 (3d Cir.2000) ("*RTC v. F & D* "). In *RTC v. F & D,* the Third Circuit Court of Appeals broke down this bond language into its component parts, stating that:

the following elements [must] be present in order for a loss to constitute a covered event:

(1) the insured must incur a loss;

(2) the loss must have 'result[ed] directly' from dishonest or fraudulent acts of an employee or employees;

(3) the employee must have committed the acts with the 'manifest intent' to cause the insured to suffer the loss sustained ...; and

(4) the employee must have committed the acts with the 'manifest intent' to obtain a financial benefit for the employee or a third party ...

*Id.* at 636. The Court stressed that if the defendant could establish that one of the above requirements was not met, the "loss would not constitute a covered event." *Id.* In that circumstance, the Court would affirm an entry of summary judgment in favor of the defendant. *Id.*

This Court is now faced with the same issue. If National Union can show, as a matter of law, that just one of the bond requirements cannot be satisfied by the FDIC, National Union is entitled to summary judgment. Stated more precisely, if National Union can demonstrate that the FDIC has failed to present affirmative evidence from which a reasonable jury could infer the existence of *each* requirement of the bond, National Union is entitled to summary judgment.

## B. Mikula's Alleged Concealment

Plaintiff asserts that Mikula had knowledge of certain appraisals and reports which strongly suggested that City Federal would be unable to collect on the outstanding loans to Port Liberte' Partners. The appraisals showed that the Port Liberte' project was in danger of being unprofitable and had Mikula revealed them to the executive committee, the additional nineteen million plus would not have been approved by executive committee.

### 1. Touche Ross Report

The FDIC claims that a study conducted by Touche Ross in or around March 1989 for National Westminster Bank ("NatWest") showed that NatWest had decided to write off millions of dollars of losses on the loans it had made in support of the Port Liberte' project. Because NatWest was the "co-lead lender" on the Port Liberte' project along with City Federal, presumably this report would have been

important to the executive committee.[8] Moreover, the study showed that NatWest refused to participate in any future lending to the project. The FDIC asserts that this report and its conclusions were given to Mikula, but Mikula did not disclose this information or otherwise refer to this report during executive committee meetings. Defendant claims that Mikula told members of the executive committee about the report, and that even if it was not discussed at an actual meeting, committee members were nevertheless aware of its existence.

### 2. Ward Appraisal

George Ward, the appraiser for City Appraisal discussed above, preliminarily concluded in a memorandum to Mikula in June 1989 that the Port Liberte' project was not worth nearly as much as initially valued by Ward in April 1988, but instead was worth about six million dollars less than first appraised. Notably, the outstanding loans to Port Liberte' Partners were greater than this appraised value. Ward's memorandum concluded that the Port Liberte' project was no longer economically feasible and Ward felt that the project should be redesigned in an effort to restore it to profitability. If Ward's appraisal was correct, it showed that City Federal was substantially undercollateralized on the loans to Port Liberte' Partners. Mikula has no specific recollection about whether he discussed Ward's memo at an executive committee meeting. Pl.Ex. E, 166:6–16.[9] At that point, Mikula allegedly asked Ward to perform an updated, more detailed appraisal. Plaintiff asserts that Ward complied with this request and thereafter concluded that the financial situation of the project was "even more severe" than he had previously thought.

### 3. Landauer Appraisal

Landauer & Associates were retained by City Federal on or about June 7, 1989 to perform another appraisal of the project. Landauer was retained because of the possibility that other participating banks might not have confidence in an appraisal performed by Ward since Ward worked for City Appraisal, a subsidiary of City Federal. The Landauer appraisal concluded that the Port Liberte' project was no longer economically feasible and estimated losses on the project of between seventy and ninety million dollars.

Plaintiff claims that on or about September 15, 1989, Mikula attended a meeting with Landauer representatives, including an MAI appraiser named Rose Perrizo, and that Perrizo told Mikula that she believed the project was not economically feasible. Thereafter, a Board meeting was held on October 9, 1989. Mikula was in attendance and the Port Liberte' project was discussed at the meeting, but Mikula allegedly failed to disclose the details of his September 15th meeting with Landauer, stating only that the Landauer appraisal would be completed within 30 days.

The minutes of that October 9th Board meeting indicate that all present were keenly aware that the Port Liberte' pro-

---

**8.** The FDIC also asserts that at executive committee meetings on April 18th and 19th, 1989, Mikula attempted to mislead the executive committee about NatWest's reason for not extending any new loans to the project. The FDIC cites to Mikula's statement at the meeting that NatWest was approaching its "loan to one borrower" limit. Pl.Ex. T. The FDIC believes Mikula used this language to disguise NatWest's real reason for not disbursing new loans, which was that they found that the project was no longer economically feasible.

**9.** Ward actually testified that he was unsure whether he reported his preliminary findings to Mikula or to Hermann. Moreover, Ward did not recall discussing specific numbers.

ject was in financial trouble. The possibility of a "work-out" situation was discussed and substantial losses were forecasted. Additionally, the minutes suggest that Atherton did most of the reporting on the Port Liberte' loan situation. According to Plaintiff, the executive committee later became aware of Mikula's prior meeting with Perrizo, and Mikula was terminated in November 1989. Compl., ¶¶ 67–68.

Plaintiff argues that if Mikula had brought these reports and appraisals to the attention of the executive committee, the committee would not have approved the additional nineteen million plus loans. The Court cannot overlook the fact that it was the executive committee, not Mikula, which ultimately made the determination to lend additional funds to the Port Liberte' project even though the executive committee knew that the Port Liberte' loans were in default and that the project was in dire financial straits. *See* Pl. Rule 56.1 Statement. And it was the executive committee, according to Plaintiff, which bore the sole responsibility for approving new loans.

At oral argument, the Court specifically requested from Plaintiff's counsel "proof which shows there was a representation to the Board that no disbursement would be made without an appropriate appraisal in hand or that there is language in the approval of the loan that no disbursements will be made without the proper appraisal in hand." 3/16/01 Tr. at 40, lines 24–25, 41, lines 1–4. The Court did not request evidence showing that it was the general policy to require a positive appraisal before disbursing the loans, but rather, the Court was (and is) interested in any affirmative representations made by Mikula, or evidence showing that the Board specifically told Mikula that no additional loans should be disbursed until such time as a positive appraisal is completed.

Plaintiff submitted materials in response to the Court's request. While the supplemental submission makes clear that it was the bank's general policy not to make new loans until a supporting appraisal is obtained, Plaintiff's submission fails to demonstrate any affirmative representations by Mikula to the Board or instructions from the Board to Mikula regarding the procurement of a positive appraisal.

Plaintiff cites to Mikula's deposition testimony of July 7, 2000, wherein Mikula stated that "if the bank was considering extending another 58 million bucks or whatever it was, you couldn't do it unless it was supported by an appraisal." Mikula Dep. at 151, lines 22–25. Also filed as an exhibit to Plaintiff's supplemental submission is a copy of City Federal's standard commitment letter, which states in part that the obligation to lend money is contingent upon receiving a conforming appraisal by a MAI appraiser. Pl. Supplemental Submission, Ex. B. This does not answer the question of whether Mikula affirmatively represented to the executive committee that he would not disburse loans until he had a positive appraisal in hand.

Plaintiff further cites to a portion of an actual commitment letter sent to Port Liberte' Partners wherein City Federal agreed to lend additional funds. Specifically, the letter contains a provision stating that the appraisal condition had been met. But Mikula did not sign the letter making this representation—David Hermann did. This letter is not an affirmative representation made to the Board, but instead was a representation made by Hermann to the borrower, Port Liberte' Partners.

Plaintiff also refers the Court to the deposition testimony of John Kean wherein Kean agreed that a City Federal loan officer was not authorized to close a loan and advance funds if the appraisal conditions were not met. Again, this evidence

simply demonstrates a general policy of the bank.

While the Court is cognizant of its obligation to draw all inferences in favor of the non-moving party, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348, the Court nevertheless is unconvinced that the evidence here sufficiently demonstrates that Mikula concealed the reports or otherwise acted dishonestly. But because this motion is decided on other grounds herein, the Court need not make a finding to this effect.

**C. Two Manifest Intents**

■ Plaintiff has a double burden of showing manifest intent in this case. Plaintiff must show that Mikula acted with the specific intent to cause the bank a loss and with the specific intent to obtain a financial benefit for a third party. When a question of intent is material to a cause of action, as it is here, resolution on a summary judgment basis is generally improper. *See Coolspring Stone Supply, Inc. v. American States Life Insurance Co.*, 10 F.3d 144, 148 (3d Cir.1993); *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981); *accord First Nat'l Bank of Louisville v. Lustig*, 961 F.2d 1162, 1166 (5th Cir.1992). However, if a plaintiff cannot make an initial evidentiary showing of the requisite intent, summary judgment is appropriate. *Northeast Jet Center, Ltd. v. Lehigh–Northampton Airport Auth.*, 1997 WL 230821, at *6 (E.D.Pa. May 5, 1997).

■ The Court must therefore determine whether the FDIC has made an initial evidentiary showing of the two manifest intents required under the bond. Plaintiff's Complaint specifically alleges that Mikula's actions were done "with the intent to secure approval of additional project financing from Port Liberte' Partners from City Federal which in turn allowed the Project to proceed at a time when the

Project had no financial viability." Compl., ¶ 42. Plaintiff further alleges that Mikula's conduct was "done with the intent to deceive City Federal and obtain a financial benefit for himself and/or for others, and to cause City Federal to sustain a loss." *Id.*, ¶ 43.

The Fifth Circuit was presented with the same question: "[U]nder what circumstances [does] an employee who acts dishonestly to obtain the approval of loans [have] the manifest intent to cause the bank a loss[?]" *Lustig*, 961 F.2d at 1165. The evidence in *Lustig*, a case involving unrecovered loans, showed that a suspect bank employee who oversaw large construction loans "misrepresented the identity of permanent lenders, the number of pre-sold project condominiums, exaggerated the size of borrower's contributions, and falsified various loan-related documents." *Id.* at 1163. In fact, that employee later pled guilty to criminal charges of deception and fraud. The Fifth Circuit held that the district court erred in granting summary judgment in favor of the insured bank, finding that the court improperly considered a guilty plea (later withdrawn) as conclusive evidence that the narrow terms of the bond were satisfied. *Id.* at 1164.

Additionally, the Fifth Circuit found that the district court erred in granting summary judgment on the issue of manifest intent to confer a benefit. The Court found that there was evidence in the record that the person who received the disputed loans from the bank (a third party) gave the suspect bank employee $40,000 "ostensibly to show her good faith in an offer of future employment to him." *Id.* The Court found that based on this evidence, a jury could infer that the employee "acted with the intent to benefit himself at the bank though career advancement and not for direct personal financial gain." *Id.* at 1167. If that were true, there would be

no coverage under the bond. Because this contradictory evidence created an ambiguity sufficient to present a material issue of fact, summary judgment in favor of the plaintiff was improper. *Id.* Unquestionably, the evidence in favor of coverage in this matter does not rise to the level of that in *Lustig.*

The Fourth Circuit Court of Appeals has also addressed the manifest intent issue inherent in fidelity bond cases. *General Analytics Corp. v. CNA Ins. Cos.*, 86 F.3d 51, 53 (4th Cir.1996). "Establishing intent is central to proving coverage under employee dishonesty policies." *Id.* The Fourth Circuit described manifest intent as "specific intent, analogous to that required by criminal law. Thus if a dishonest act has the *un* intended effect of causing a loss to the employer or providing a benefit to the employee, the act is not covered by the policy." *General Analytics*, 86 F.3d at 54.[10]

The *General Analytics* Court further stressed that bonds like the one at issue here "are designed to provide coverage for a specific type of loss characterized by embezzlement, which involves the direct theft of money." *Id.* (*citing* Michael Keeley, *Employee Dishonesty Claims: Discerning the Employee's Manifest Intent,* 30 Tort & Ins. L.J. 915, 919 (1995)). Moreover, these bonds require the insured bank to prove *two* intents on the part of the employee, one being an intent to cause the bank a loss, and the other being an intent to gain a financial benefit for the employee or some third party. Both of these intents must be "manifest, i.e., readily perceived or obvious." *Id.* at 54 (*citing First Fed'l Sav. & Loan Ass'n v. Transamerica Ins. Co.*, 935 F.2d 1164, 1166–67 n. 3 (10th Cir.1991)).

In construing the meaning of manifest intent in the fidelity insurance context, the Third Circuit conducted a thorough review of the differing Circuit Court interpretations of manifest intent in this context and ultimately:

> agree[d] with the approach espoused by the Courts of Appeals for the Second, Fourth and Fifth Circuits, and h[e]ld that the term 'manifest intent' as it is used in the fidelity provision requires the insured to prove that the employee engaged in dishonest or fraudulent acts with the specific purpose, object or desire both to cause a loss and obtain a financial benefit. Inasmuch as we equate the 'substantially certain to result' standard with the mental state 'knowingly,' we are of the view that 'purposefully' rather than 'knowingly' better captures the meaning of "intent" as it used in the fidelity provision, given the history that prompted its inclusion in the dishonesty definition and its stated purpose. Indeed, we believe that our construction strikes an appropriate bal-

---

**10.** Notably, the district court in *General Analytics* had also granted summary judgment in favor of the insured plaintiff, finding that no reasonable jury could have found that the narrow terms of the bond were not met. *See id.* The circumstantial evidence proffered by the plaintiff in *General Analytics* was substantial, but the defendant put forth other evidence rebutting the plaintiff's claim, thereby creating an ambiguity. *See id.* at 55.

This evidence showed that the employee "conferred a benefit on Pioneer in the form of profits from the sale and caused a loss to General Analytics from ordering useless products." *Id.* "While such conduct could have been accompanied by both the intent to benefit Pioneer and the intent to injure General Analytics, the evidence in this case of employee intent to benefit Pioneer is ambiguous, allowing for the possibility that the employee conduct was not accompanied by that intent." *Id.* Specifically, the Court found that this evidence could have shown that the employee was acting out of revenge against her employer and not because of an intent to financially benefit herself or a third party. *Id.*

ance because it comports with the drafters' obvious intent to limit the types of employee misconduct covered by this provision but ensures that proof of the employee's recklessness and the substantial likelihood of loss factor into the ultimate inquiry into the employee's subjective state of mind. *RTC v. F & D*, 205 F.3d at 642. The Court went on to emphasize that "the term 'manifest intent' requires proof of the employee's purpose in engaging in the dishonest or fraudulent acts," and the Court was "cognizant that the employee's actual subjective state of mind virtually is impossible to prove absent resort to circumstantial evidence—objective indicia of intent." *Id.*

Plaintiff relies on *RTC v. F & D* in support of its argument that the circumstantial evidence here demonstrates Mikula's manifest intent in this case. Clearly, *RTC v. F & D* mandates that summary judgment should not be granted if circumstantial evidence is proffered suggesting that a bank employee knew or was substantially certain that his conduct would result in a loss to the bank "that would inure to the employee's benefit ..." *Id.* at 643. The evidence in *RTC v. F & D* which was sufficient to create an ambiguity is quite different than the evidence before this Court.

*RTC v. F & D* involved the sale of City Collateral, an affiliate of City Federal Savings Bank—the same bank involved in the case at bar. There were three suspect employees involved in the *RTC v. F & D* case who were aware that one of City Collateral's outstanding loans, a warehouse credit line to Northwest Mortgage Company, had significant financial problems. When those employees were informed that City Federal was planning to sell City Collateral they "promptly initiated discussion with City Federal about their potential compensation if the sale were consummated" and ultimately negotiated "golden handcuff agreements." *Id.* at 622. Those employees were then assigned to work on the credit section of the offering memorandum for potential City Collateral buyers, but failed to disclose therein that the Northwest credit line was in workout status at that time. *See id.*[11]

In the fall of 1988, a Hawaii based corporation called HonFed expressed interest in purchasing City Collateral, and the suspect employees were confident that HonFed would make the purchase and hire them. In October of that year, closing agreements were signed by the three employees which provided that they would receive their golden handcuff payments if they assisted City Federal in the sale of City Collateral, and if the sale ultimately closed. The amount of their compensation was dependant upon the gross profit from the sale and whether the employees were hired by the purchaser.

During the fall of 1988, the employees began negotiating their future employment with HonFed. HonFed signed a letter of intent agreeing to purchase all of City Collateral's loans, with the exception of those loans which were "non-performing or otherwise substandard." *Id.* at 623. Hon-

---

11. Additionally, a presentation was given to City Federal requesting additional funds for the Northwest credit line. A written recommendation was prepared under the supervision of one of the suspect employees, and the fact that the Northwest loans were technically in default and in workout status was not disclosed in the recommendation. That employee also reported to City Federal that the

Northwest loan would be included in the sale, but then told City Collateral employees that it would not be included in the sale. Based on the recommendation, City Federal approved the issuance of new loans to Northwest but with certain conditions. When Northwest failed to meet those conditions, City Federal discontinued its funding on the credit line.

Fed decided not to purchase the troubled Northwest credit line as part of the sale (ultimately leading to a large loss for City Federal).

The Third Circuit found, on these facts, that the issue of whether the employees acted dishonestly in the sale of City Collateral to HonFed with the manifest intent to obtain more profitable employment packages with HonFed was a jury question. Indeed, deposition testimony suggested that the employees concealed information for that specific purpose. *Id.* at 650. Specifically, the Court noted certain evidence from which a reasonable jury could infer a manifest intent to obtain future employment:

> In determining the employees' 'manifest intent' to obtain future employment and signing bonuses, the jury certainly could consider the events that occurred subsequently to that date, in particular that December 9, 1988, memorandum to HonFed, and the fact that the individual defendants continued their course of concealment through the date of the sale. These events would be particularly probative on this issue, given the circumstance that as of that time frame, [the employees] were certain to gain future employment, substantial salaries and signing bonuses if the sale occurred smoothly and on terms that were favorable to HonFed. In that sense, then, [the employees] chances for financial prosperity were tied to HonFed's ultimate success, which inevitably would come at City Federal's expense.

*Id.* at 650. The circumstantial evidence in *RTC v. F & D* allowed for an inference that the employees manifestly intended to cause a loss and to obtain a financial benefit for themselves. However, and though not relevant to the *RTC v. F & D* Court's decision, the Court chose not to review the district court's finding that no reasonable jury could infer that the City Collateral employees intended to benefit the third party HonFed. *Id.* at 651. On that issue, the district court had found, based on the evidence before it (which was summarized generally *supra* ) that no jury could infer that the employees acted fraudulently or dishonestly for the specific purpose of conferring a benefit on HonFed since the employees began concealing information months before HonFed expressed an interest in purchasing City Collateral. *Id.*

Although *RTC v. F & D* held that circumstantial evidence may support an inference of manifest intent in fidelity bond cases, the Court did not overlook the fundamental legal principle that the outcome of all cases turns on their unique facts. *Id.* at 635. Nevertheless, Plaintiff argues that *RTC v. F & D* requires this Court to find that Mikula may have had the requisite manifest intent to cause a loss and the requisite manifest intent to obtain a benefit for a third party. But Plaintiff has not made an initial evidentiary foundation from which a jury could reasonably infer that Mikula intentionally concealed important information knowing it to be substantially certain that such conduct would improperly benefit a third party. *See RTC v. F & D*, 205 F.3d at 644.

Assuming, *arguendo*, that Mikula was substantially certain that issuing the additional advances and loans would cause the bank to sustain a loss, absolutely nothing in the record supports an inference that it was Mikula's specific purpose and belief that Port Liberte' Partners and its subcontractors would improperly benefit from the additional loans. And, unlike the suspect employees in *RTC v. F & D*, Mikula did not stand to gain personally by loaning additional funds to the Port Liberte' project.

As indicated previously, Plaintiff contends that Mikula intended to improperly

benefit third party subcontractors. Plaintiff's counsel argued that "[t]he money was used—the money did not gain the bank one penny of benefit because the bank had already paid for the work that these subcontractors had done. But these subcontractors were not paid by Port Liberte' Partners because Port Liberte' Partners were doing other things with the money." Tr. at 17, lines 4–8. "Mikula authorized, I think, over half of this $19,000,000 to be paid to subcontractors and other creditors of the partnership for work that had already been done, already been paid for by the bank and stood the bank not one penny of gain." *Id.* at lines 14–18. "[T]he rest of the funds were paid to Port Liberte' Partners directly … these payments were made to benefit third parties just as the bond required." *Id.* at 24–25. Counsel further argued that "[t]he bank directly paid these subcontractors because they wanted to be sure—Mikula wanted to be sure they got paid." *Id.* at 18, lines 7–9. "I believe Mikulas' purpose was to pay subcontractors and the borrower, Port Liberte' Partners, knowing that this money could never be repaid to the bank." *Id.* at 18, lines 24–45; 19, line 1.

■ Plaintiff's argument that Mikula intended to improperly benefit these third parties is unsupported by evidence in the record. "Legal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute to defeat a summary judgment motion." *Jersey Central Power & Light Co. v. Twp. of Lacey,* 772 F.2d 1103, 1109–10 (3d Cir. 1985), *cert. denied,* 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986). Therefore, counsel's thoughts and beliefs about Mikula's purpose is not admissible evidence which can be used for purposes of establishing the two requisite manifest intents.

■ A suspect bank employee's specific purpose is an initial, threshold question when determining whether coverage is proper under this type of financial institution bond. "[N]either an employee's recklessness or his knowledge that a result was substantially certain to occur would satisfy the language of the policy, absent that inference of specific intent." *RTC,* 205 F.3d at 642. In other words, for a plaintiff to make out a valid claim under the bond, there must exist some evidence showing that the employee *desired* to cause the bank a loss and that he *also desired* to financially benefit himself or a third party. *See id.* at 637. It may be that Mikula and others were negligent in their actions, and made poor banking decisions, however, negligence and bad business practices are not the same as having a specific purpose to cause the bank a loss and to obtain an improper financial benefit. Because Plaintiff has failed to make an initial evidentiary showing of the requisite manifest intents, summary judgment must be granted in favor of Defendants.

**D. Covered Financial Benefit**

■ In addition to the foregoing, the National Union bond, like most other bonds of this nature, has an exclusionary clause which states that a covered "financial benefit does not include any employee benefits earned in the normal course of employment." Ex. A–34.[12] This type of exclusionary language in fidelity bonds has been found to also exclude coverage for

---

**12.** Plaintiff's counsel has argued that a portion of the additional nineteen million plus was paid to subcontractors. However, no evidence of such payments has been submitted to the Court. Plaintiff's counsel submitted as Exhibit A to his letter of April 18, 2001, a check paid by Port Liberte' Partners to Millington Nurseries in the amount of $20,000, evidencing payment to a third party. This was not, however, a direct payment from City Federal to a third party.

financial benefits to third parties which are conferred in the normal course of business. *See North Jersey Savings & Loan Assoc. v. Fidelity & Deposit Co. of Maryland*, 283 N.J.Super. 56, 68–69, 660 A.2d 1287 (Law Div.1993). Specifically, *North Jersey* held that because evidence suggested that money received by third parties was for payment of fees owed in the normal course of business (broker's fees and fees for origination and servicing of loans), an intent to benefit a third party could not be proven and summary judgment in the defendant's favor was granted. *Id.* at 68–70, 660 A.2d 1287.

Plaintiff's supplemental submission of April 18, 2001, relies on a District of Ohio case for the proposition that Mikula conferred an improper financial benefit on third parties. The District of Ohio Court stated in dicta that "Courts have found indicia of manifest intent to obtain a financial benefit outside the normal course of employment where an employee has a financial interest in the entity who benefits from the improper transaction." *First Bank of Marietta v. Hartford Underwriters Mut. Ins. Co.*, 997 F.Supp. 934, 937 (S.D.Ohio 1998), *aff'd on other grounds*, 198 F.3d 245, 1999 WL 1021852 (6th Cir. 1999). But the Court found in that case that the employee did not have the manifest intent to obtain an improper benefit because all he did was loan money in an amount greater than that which he was authorized to disburse and thereby earned greater commissions. But commissions are nothing more than fees earned in the

normal course of employment and therefore were not covered under the bond. *Id.* at 938. *First Bank* described, again in dicta, an improper financial benefit as "those cases which may arise where the employee improperly approved the loan to a person or entity he knew was not qualified for such loan" or "where the employee knew the loan was to be used for an improper . . . purpose." *Id.* at 938–39. The *First Bank* Court found, however, that the unauthorized excess loans were not made to an unqualified third party and the loans were not improper, because after the suspect employee was terminated, the bank continued lending funds to that same third party. *Id.*

Relying on *First Bank*, Plaintiff here claims that by allowing the additional loans to Port Liberte' to go forth, knowing Port Liberte' to be unqualified, Mikula conferred an improper financial benefit on Port Liberte'. It is undisputed, however, that the executive committee bore the sole responsibility for loan approval, and even if Mikula knew Port Liberte' was unqualified and kept that information from the executive committee, there is still nothing in the record to suggest that it was Mikula's dual intent to cause the bank a loss and to confer an improper benefit on Port Liberte'. Furthermore, there is no evidence in the record indicating that Mikula knew the additional loans were going to be used for an improper purpose.[13]

In the case at bar, the third party subcontractors were owed payment for

---

13. In another case construing identical exclusionary bond language, summary judgment was granted to a defendant insurer because the evidence failed to show that the suspect employees intended to obtain a covered financial benefit. Instead, the evidence showed that the suspect employees falsified information on loan applications in order to make more loans and thereby collect more commissions from their employer. *See Verex Assur-*

*ance, Inc. v. Gate City Mortgage Co.*, No. C–83–0506W, 1984 WL 2918, at \*1–2 (D.Utah Dec.4, 1984). Even though those loans may have been made improperly or even fraudulently, the employees' intent in making these loans was to earn a commission, which was considered to be a financial benefit earned in the normal course of employment and therefore not covered by the bond. *See id.*

work already performed in the normal course of business. But as stated by Plaintiff's counsel "these subcontractors were not paid by Port Liberte' Partners."[14] Nothing in the record supports an inference that the payments (made from the additional loan proceeds) were other than in the normal course of business, and it is not a disputed fact that Port Liberte' was a *proper* beneficiary of the loan proceeds. There cannot be a manifest intent to improperly benefit third parties if the recipients of the funds are the intended objects of those funds. Stated otherwise, to disburse funds to those whom the executive committee meant for the funds to be disbursed cannot support an evidentiary inference of an improper benefit under the fidelity bond. The additional loans are not the type of improper financial benefit contemplated by the bond, and therefore, are excluded from coverage.

## CONCLUSION

After nearly five full years of litigation, Plaintiff has failed to develop sufficient circumstantial evidence indicating that Mikula acted with the manifest intent or specific purpose to cause a loss to City Federal and to obtain an improper financial benefit for a third party. This Court therefore finds that no reasonable jury could infer that Mikula's actions and City Federal's losses "fall[ ] within the narrow parameters of coverage." *Id.* at 637; *see also North Jersey Savings & Loan Assoc. v. Fidelity & Deposit Co. of Maryland,* 283 N.J.Super. 56, 660 A.2d 1287, 1292–93 (1993). *General Analytics,* 86 F.3d at 54. Plaintiff has not set forth any admissible evidence, direct or circumstantial, from which a reasonable jury could infer that Mikula manifestly intended to cause a loss to the bank *and* that he manifestly intended to obtain an improper financial benefit for a third party.

The Court finds that, based on the record before it, the FDIC has not rebutted National Union's showing of an absence of a material factual dispute with circumstantial evidence from which a reasonable jury could infer the manifest intents required by the bond.[15] There has been no evidence proffered suggesting that Mikula was "substantially certain that his … conduct would cause a loss that would inure to his benefit" or to the benefit of some third party. *RTC,* 205 F.3d at 643. As a result, summary judgment in favor of National Union is proper. *See Oritani Savings & Loan Assoc. v. Fidelity & Deposit Co. of Maryland,* 821 F.Supp. 286, 291 (D.N.J.1991)(rejecting plaintiff's argument that term manifest intent included reckless acts from which intent to cause loss could be inferred and granting summary judgment on that basis).[16]

---

**14.** Certainly there is no indication in the record, nor is it even argued, that Mikula had a personal relationship with the subcontractors and stood to benefit in the future if he extended payment to them at that time.

**15.** Although there are factual disputes in this case, there are no genuine factual issues in dispute which are material for purposes of answering the legal question before the Court. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (stating that a fact is material if it "might affect the outcome of the suit under the governing law").

**16.** The bond also requires that the insured's loss result directly from the dishonest acts of the suspect employee. Here, the losses are the direct result of the loans not being repaid by the borrowers. The *RTC* Court found that the loss must be proximately caused by the dishonest conduct, or stated otherwise, must be a "substantial contributing factor to the harm suffered." *RTC,* 205 F.3d at 656–57. Contrary to Defendant's contention in its moving brief, the Court finds that the causation question would be more properly resolved by a jury. Since the Court grants summary judgment for other reasons, this is a moot point.

From anyone's point of view, this case involved bad banking transactions. Take away all of the legalese, and it is clear that the reality of this case is simply mismanaged banking. Plaintiff is seeking to convert this bad banking into egregious employee dishonesty in order to collect on its large losses. But there was no evil intent on Mikula's part; at worst, Mikula's conduct could be characterized as incompetent or negligent. It is equally obvious that his efforts were directed towards salvaging (for the bank's benefit) the Port Liberte' loans.

The National Union bond covers only very specific types of losses; losses resulting from incompetency or bad judgment do not meet the criteria. Plaintiff has simply failed to make an initial evidentiary showing that Mikula's actions surrounding the Port Liberte' loans fall within the narrow parameters of coverage under the National Union bond.

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED.**